IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-184-ELG |
| | ) | (Chapter 11) |
| Swain Landing LaPlata JC, LLC | ) | |
| | ) | |
| Debtor. | ) | |

## **OPPOSITION TO MOTION TO DISMISS THE BANKRUPTCY CASE**

Maurice B. VerStandig, Esq.
Bar No. MD18071
The Belmont Firm
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
*Counsel for the Debtor*

## <u>TABLE OF CONTENTS</u>

I.      Introduction ................................................................................................................ 1

II.     Argument: The Motion Merits Denial ........................................................................ 2

    a.  The Debtor Had Authority to Seek Bankruptcy Protection ...................................... 2

    b.  Swain Landing is a Small Business ......................................................................... 8

    c.  The District of Columbia is an Appropriate Venue ................................................. 13

    d.  A Good Faith, Bankruptcy-Centric Reason Drives the Effort to
        Reorganize ............................................................................................................. 17

    e.  Removal was Proper ............................................................................................... 20

III.    Conclusion ................................................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Capitol Motor Courts v. Le Blanc Corp.*,
201 F.2d 356 (2d Cir. 1953) ........................................................ 14

*Commissioner v. Soliman*,
506 U.S. 168 (1993) ................................................................ 14

*Granader v. Peachtree Lane Assocs. (In re Peachtree Lane Assocs.)*,
150 F.3d 788 (7th Cir. 1998) ..................................................... 14

*Hager v. Gibson*,
188 B.R. 194 (E.D. Va. 1995) ....................................................... 3

*In re Balt. Food Sys., Inc.*,
71 B.R. 795 (Bankr. D.S.C. 1986) ............................................... 15

*In re Blue*,
630 B.R. 179 (Bankr. M.D.N.C. 2021) .......................................... 11

*In re Commonwealth Oil Refin. Co.*,
596 F.2d 1239 (5th Cir. 1979) ................................................... 14

*In re E. End Dev.*,
491 B.R. 633 (Bankr. E.D.N.Y. 2013) ............................................ 6

*In re Emergency Hosp. Sys., LLC*,
2024 Bankr. LEXIS 2905 (Bankr. S.D. Tex. Dec. 5, 2024) ................... 5

*In re Fama-Chiarizia*,
655 B.R. 48 (Bankr. E.D.N.Y. 2023) ............................................ 12

*In re Heark Corp.*,
18 B.R. 557 (Bankr. D. Md. 1982) ................................................ 9

*In re Hillman*,
2023 Bankr. LEXIS 1448 (Bankr. N.D.N.Y. June 2, 2023) .................. 12

*In re J.G. Robins, Inc.*,
2003 Bankr. LEXIS 990 (Bankr. N.D. Iowa Aug. 22, 2003) ................ 16

*In re Lakeway Int'l, L.L.C.*,
2001 Bankr. LEXIS 2148 (Bankr. D. Neb. Mar. 19, 2001) ................... 17

*In re Lexington Hosp. Grp., LLC*,
577 B.R. 676 (Bankr. E.D. Ky. 2017) ............................................ 6

*In re Nat'l Small Bus. All.*,
642 B.R. 345 (Bankr. D.D.C. 2022) ............................................................. 15

*In re Offer Space, LLC*,
629 B.R. 299 (Bankr. D. Utah 2021) ............................................................ 11

*In re Pickeral*,
267 B.R. 1 (Bankr. D.D.C. 2001) ................................................................. 16

*In re Port Arthur Steam Energy, L.P.*,
629 B.R. 233 (Bankr. S.D. Tex. 2021) .................................................... 10, 11

*In re Seven Stars on the Hudson Corp.*,
618 B.R. 333 (Bankr. S.D. Fla. 2020) .......................................................... 15

*In re Shapiro*,
128 B.R. 328 (Bankr. E.D.N.Y. 1991) .......................................................... 15

*In re Wetter*,
620 B.R. 243 (Bankr. W.D. Va. 2020) .......................................................... 15

*Legal Aid Soc'y of N.Y. v. United States*,
92 Fed. Cl. 285 (Fed. Cl. 2010) ..................................................................... 5

*Maxwell v. Mazor*,
2016 Md. App. LEXIS 747 (Md. App. Apr. 18, 2016) .................................... 9

*Nat'l Loan Inv'rs, L.P. v. Rickerson (In re Rickerson)*,
636 B.R. 416 (Bankr. W.D. Pa. 2021) .......................................................... 10

*Old Fort Improvement Co. v. Lea*,
89 F.2d 286 (4th Cir. 1937) ........................................................................... 9

*Peide Yan v. Zhengang Zhang*,
2018 U.S. Dist. LEXIS 41603 (D. Md. Mar. 14, 2018) ................................... 9

*Price v. Gurney*,
324 U.S. 100 (1945) ...................................................................................... 3

*Price v. Upper Chesapeake Health Ventures*,
995 A.2d 1054 (Md. App. 2010) ................................................................... 9

*United States v. Bolton*,
496 F. Supp. 3d 146 (D.D.C. 2020) ............................................................... 5

**Statutes**

11 U.S.C. § 547 ....................................................................................................... 1, 8

11 U.S.C. § 1116 ....................................................................................................... 10

11 U.S.C. § 1187 ....................................................................................................... 10

28 U.S.C. § 157 ......................................................................................................... 21

28 U.S.C. § 1408 ....................................................................................................... 14

28 U.S.C. § 1452 ....................................................................................................... 20

Md. Code, Corps. & Ass'ns, § 4A-402 ...................................................................... 3

Md. Code, Corps. & Ass'ns, § 4A-403 ...................................................................... 3

**Rules**

Federal Rule of Bankruptcy Procedure 1014 ....................................................... 15, 17

Federal Rule of Bankruptcy Procedure 1020 ......................................................... 8, 13

United States Bankruptcy Court for the District of Columbia Local Rule 9013-1 ........................ 1

United States District Court for the District of Maryland Local Rule 402 .................................. 21

**Treatises**

Grover C. Grismore, Principles of the Law of Contracts § 105 (1947) ......................................... 5

Comes now Swain Landing LaPlata JC, LLC ("Swain Landing" or the "Debtor"), by and through undersigned counsel, pursuant to Local Rule 9013-1, and in opposition to the Motion to Dismiss Bankruptcy Case (the "Motion," as found at DE #25) filed by Claudia Engelhorn ("Ms. Engelhorn") and White Pearl, LLC ("White Pearl") states as follows:

I.    **Introduction**

Ms. Engelhorn and White Pearl urge this case be dismissed because (i) the Debtor lacked authority to petition for chapter 11 relief; (ii) the Debtor is not actually a "small business" within the definitional ambit of Title 11 of the United States Code (the "Bankruptcy Code"); (iii) venue is improper; and (iv) this case was filed in bad faith, without a legitimate bankruptcy purpose. The Motion is well-written, well-cited, and compelling. Problematically, however, the Motion is predicated upon an erroneous assertion of fact, ignores plain statutory language, ignores well-settled case law on multiple fronts, and also ignores the very docket entries comprising this case.

The Motion merits denial insofar as (i) the Debtor's operating agreement clearly allows Michael Postal ("Mr. Postal") to take actions on the entity's behalf, including petitioning for bankruptcy relief; (ii) the Debtor handily complies with the rigors of being a small business debtor (and, even if somehow found to not comply, would still be permitted to reorganize in chapter 11, just outside of Subchapter V); (iii) the District of Columbia was the Debtor's *only* place of business when this case was filed and has always been the Debtor's principal place of business, with Ms. Engelhorn and White Pearl having waited far too long to challenge venue in any event; and (iv) this case was—rather transparently—filed to avoid a loss of the Debtor's real estate asset, using the allowances of Section 547 of the Bankruptcy Code.

While each of the foregoing points is addressed in greater detail *infra*, it does, macroscopically, bear notation that the Motion is highlighted by the selected quotation of

1

governing law and over-reliance on a since-removed state court case. Ms. Engelhorn and White Pearl assuredly appreciate that Maryland law allows for an operating agreement to delegate to a manager the right to file for bankruptcy protection, just as they are too sophisticated of litigants to not know that Swain Landing entered into an operating agreement to which they are bound. Their litigation claims against the Debtor—as will be chiefly discussed in connection with the adversary proceeding the movants are actively trying to stymie from reaching this Honorable Court—are facially suspect and seemingly the byproduct of an effort to haphazardly scorch earth. It would defy logic for those claims to have invited this bankruptcy, especially when one need glance no further than the docket herein to realize Swain Landing found itself in chapter 11 when pursuit of an avoidance action became the only means of recovering real estate—something that, more than slightly ironically, will ultimately prove to the financial benefit of White Pearl.

For these reasons, and as extrapolated upon below, it is respectfully urged this Honorable Court deny the Motion.

## II.    Argument: The Motion Merits Denial

### a.  The Debtor Had Authority to Seek Bankruptcy Protection

Ms. Engelhorn and White Pearl posit that the Debtor could not have petitioned for bankruptcy relief because (i) Maryland law requires the unanimous consent of a limited liability company's members to do so; and (ii) the operating agreement of Swain Landing does not allow such in any event. Problematically, however, Ms. Engelhorn and White Pearl appear to be rather-selectively quoting from Maryland's statutory scheme. And, of equal issue, Ms. Engelhorn and White Pearl appear to be ignoring both the language of the operating agreement with which they take issue and, if their contention as to the voidness of that operating agreement is deemed valid, the clear language of the predecessor agreement that would still be in full force and effect.

2

As a starting point, the Debtor does not dispute that state law governs an entity's capacity to petition for bankruptcy relief. *See* Motion, DE #25, at ¶ 20. *See also Hager v. Gibson*, 188 B.R. 194, 197 (E.D. Va. 1995) ("If the corporation is incorporated under state law, then the district court must look to state law to decide whether the authority to file bankruptcy existed.") (citing *Price v. Gurney*, 324 U.S. 100, 106 (1945)).

Yet Ms. Engelhorn and White Pearl are at-best disingenuous in then feigning to apply relevant state law. They insist, *inter alia*, "[u]nder Maryland Code, Corporations and Associations, § 4A-403, 'A member [of an LLC] may not take any of the following actions without unanimous consent of the members: (i) institute a voluntary proceeding under the federal bankruptcy code.'" Motion, DE #25, at ¶ 26 (quoting Md. Code, Corps. & Ass'ns, § 4A-403(d)(2)(i)). This, unfortunately, is a selective quotation.

Indeed, the very beginning of the same exact statute provides, "[t]he provisions of this section apply unless otherwise provided in this title or **unless otherwise agreed**." Md. Code, Corps. & Ass'ns, § 4A-403(a) (emphasis added). And the immediately preceding section, of the same title of the same article of the Maryland Code, provides, *inter alia*:

> Except for the requirement set forth in § 4A-404 of this subtitle that certain consents be in writing, members may enter into an operating agreement not inconsistent with the articles of organization to regulate or establish any aspect of the affairs of the limited liability company, the conduct of its business, or the relations of its members, including provisions establishing:
>
> (1) The manner in which the business and affairs of the limited liability company shall be managed, controlled, and operated, which may include the granting of exclusive authority to manage, control, and operate the limited liability company to persons who are not members. . .

Md. Code, Corps. & Ass'ns, § 4A-402(a).

So, yes, Maryland law does require the members of a limited liability company to unanimously consent to a bankruptcy filing—unless an operating agreement vests managerial

3

authority otherwise. And this is a fairly important caveat given that the operating agreement of Swain Landing does just that.

There are two operating agreements for Swain Landing: the first, which was signed by all then-members upon the entity's formation (the "Original Operating Agreement," attached hereto as Exhibit A), and the second, which Ms. Engelhorn and White Pearl urge to be unsigned and problematic (the "Subsequent Operating Agreement," attached hereto as Exhibit B).[1] Since the Motion rather vehemently suggests the Subsequent Operating Agreement "is not a controlling document and should be given no weight or authority," Motion, DE #25, at ¶ 25, Swain Landing is content to rely on the Original Operating Agreement. However, in the interests of thoroughness, the Subsequent Operating Agreement is, too, discussed below.

The Original Operating Agreement was executed on January 4, 2022—the day Swain Landing was formed—by the entity's only two members at the time. That document provides the company's principal office shall be in the District of Columbia. *See* Original Operating Agreement, attached hereto as Exhibit A, at ¶ 6. The agreement designates Mr. Postal as the entity's manager. *Id.* at ¶ 16. And, perhaps most importantly, the Original Operating Agreement provides, *inter alia*, "[t]he Manager has the full, complete and exclusive power, authority, and sole discretions to take, without the consent of the Members, any and all action on behalf of the Company of whatsoever type and to make all decisions with respect thereto." *Id.* at ¶ 17.

---

[1] Though the prefatory clause of the Subsequent Operating Agreement suggests a January 3, 2022 execution date, such appears to be a drafting error insofar as (i) Swain Landing did not file articles of organization until January 4, 2022; and (ii) the e-mail circulating the Subsequent Operating Agreement to Ms. Engelhorn's counsel is from June 2023. There is some question as to whether Ms. Engelhorn ever signed the Subsequent Operating Agreement (and, if so, in what capacity); the Debtor anticipated adducing evidence on this point at a hearing on the Motion.

Lest the grant of authority be insufficiently certain, the Original Operating Agreement does go on to specifically delineate actions for which the unanimous consent of members shall be required:

> a. Incurring Company liabilities over $25,000.00.
>
> b. Incurring a single transaction expense over $25,000.00.
>
> c. Endangering the ownership or possession of Company property including selling, transferring or loaning any Company property or using any Company property as collateral for a loan.
>
> d. Releasing any Company claim except for payment in full.

*Id.* at ¶ 64. The filing of a bankruptcy petition is, of course, not one of the specifically-delineated tasks for which unanimous consent is required and thusly falls within the sweeping grant of power to the entity's manager. *See United States v. Bolton*, 496 F. Supp. 3d 146, 156 (D.D.C. 2020) ("Under the doctrine of *expressio unius est exclusio alterius*, it is well-settled that '[w]here certain things are specified in detail in a contract, other things of the same general character relating to the same matter are generally held to be excluded by implication.'") (quoting *Legal Aid Soc'y of N.Y. v. United States*, 92 Fed. Cl. 285, 299 (Fed. Cl. 2010) (quoting Grover C. Grismore, Principles of the Law of Contracts § 105, at 164 (1947))).

This position is also well supported by precedent, which regularly provides that a limited liability company's manager, enjoying broad authority under an operating agreement, is empowered to seek bankruptcy protection for the company even if such a right is not specifically delineated. *See, e.g.*, *In re Emergency Hosp. Sys., LLC*, 2024 Bankr. LEXIS 2905, at *13 (Bankr. S.D. Tex. Dec. 5, 2024) (finding a limited liability company manager is properly authorized to seek bankruptcy protection where the entity operating agreement grants broad powers "including the ability to bind the Company in relation to third parties and outside affairs, to perform any

undertaking 'necessary or advisable' for carrying on the routine business of [the company], and the ability to execute any document as deemed desirable within the Operating Manager's sole discretion."); *In re Lexington Hosp. Grp., LLC*, 577 B.R. 676 (Bankr. E.D. Ky. 2017) (finding an entity's manager had authority to file for bankruptcy relief even when the company's operating agreement contained bankruptcy-remote provisions); *In re E. End Dev.*, 491 B.R. 633, 639 (Bankr. E.D.N.Y. 2013) (finding a manager's bankruptcy filing to be appropriate where "[t]he Operating Agreement confers broad powers upon the Managing Member to act on behalf of the Debtor, and the examples set forth in the Operating Agreement are merely illustrative.").

Also noteworthily, the Original Operating Agreement expressly provides that any member admitted to Swain Landing, following execution of the Original Operating Agreement, shall be "bound by all the covenants, terms and conditions of this Agreement. . ." *Id.* at ¶ 31.

So, if Ms. Engelhorn and White Pearl are correct that (i) state law controls authority to file a bankruptcy petition (which the Debtor does not dispute); (ii) the relevant state law is that of Maryland (which the Debtor also does not dispute, since the entity is a Maryland limited liability company); and (iii) the Subsequent Operating Agreement "is not a controlling document and should be given no weight or authority," Motion, DE #25, at ¶ 25, then it would well seem the Original Operating Agreement is the controlling document that determines the authority of Mr. Postal to petition for bankruptcy protection on behalf of the Debtor. And, based on the foregoing citations to the pertinent provisions of the Original Operating Agreement, it becomes abundantly clear that Mr. Postal did, in fact, have the authority to file this case on behalf of Swain Landing.

Yet even assuming, *arguendo*, that Ms. Engelhorn and White Pearl are incorrect and the Subsequent Operating Agreement actually *is* the "controlling document," the analysis does not much change. Under that agreement, Mr. Postal remains the entity's manager. *See* Subsequent

6

Operating Agreement, attached hereto as Exhibit B ("Ex. B"), at p. 3. The document also provides

that "[a]ll operations of the Company shall be conducted by the Manager." *Id.* at § 6.2. And the

agreement, perhaps most pertinently, allows:

> In addition to the powers now or hereafter granted an authorized person of a limited
> liability company under the Act or which are granted the Manager under any
> provisions of this Agreement, the Manager shall have full, exclusive and complete
> discretion, power and authority, subject in all cases to the provisions of this
> Agreement (including Section 6.2 with respect to decisions of the Manager) and the
> requirements of applicable law, to manage, control, administer and operate the
> business and affairs of the Company for the purposes herein stated, to make all
> decisions affecting such business and affairs, to adopt such accounting rules and
> procedures as he shall deem appropriate in the conduct of the business and affairs
> of the Company and to do all things which he shall deem necessary or desirable in
> the conduct of the business and affairs of the Company. . .

*Id.* at § 6.1.

To be sure, the foregoing portion of the Subsequent Operating Agreement does go on to

delineate an exhaustive list of actions that "require Member consent." *Id.* at § 6.1.1. Those things

for which member consent is required are (i) the acquisition of real estate; (ii) the entry into capital

transactions; and (iii) the admission of new members. *Id.*[2] The document then proceeds to non-

exhaustively delineate things that do not require member consent, falling within the foregoing

broad grant of power to the manager set forth in Section 6.1. One of those delineated items that

does *not* require member consent is "to do any and all other things affecting the rights and

obligations of the Company, including, without limiting the generality of the foregoing, the

---

[2] Strangely, an intervening draft of the operating agreement—that is not the final version of the
Subsequent Operating Agreement—is appended to the Motion. *See* DE #25-7. The Debtor does
not believe there is any basis upon which to rely on this draft iteration. However, if this draft were
to be relied upon, it is meaningfully different in one critical way: this draft does not provide *any*
actions that require member consent, instead completely vesting control in the manager. So while
Swain Landing has a duty of good faith that prohibits the Debtor from feigning the veracity of the
draft appended by Ms. Engelhorn and White Pearl, Swain Landing does think it noteworthy that
the at-issue draft is actually *more* advantageous to Swain Landing (which, perhaps, is why Ms.
Engelhorn and White Pearl are so adamant the draft they attach "is not a controlling document and
should be given no weight or authority," Motion, DE #25, at ¶ 25).

employing of attorneys and the incurring of other legal expenses and the conduct or settlement of claims and litigation. . ." *Id.* at § 6.1.2.

Plainly, whether one looks to the Original Operating Agreement or to the Subsequent Operating Agreement, Mr. Postal had the authority, as manager, to commit Swain Landing to bankruptcy. Maryland law is rather clear on this point, as are the two operating agreements. And one may, accordingly, question why Ms. Engelhorn and White Pearl have elected to selectively quote applicable law, just as one may question why they have chosen to ignore the Original Operating Agreement *en toto*.

The better question, though, is less legally relevant: Swain Landing lost its sole asset to a recission action. Bankruptcy is, almost assuredly, the sole mechanism for that asset to be regained, courtesy of the provisions of Section 547 of the Bankruptcy Code. So why would Ms. Engelhorn and White Pearl, with the latter being an equity holder of Swain Landing and with both being alleged creditors of Swain Landing, wish to see this bankruptcy case dismissed? There is an almost kamikaze-esque nature to the Motion, with Ms. Engelhorn and White Pearl being seemingly so blinded by their ire with Swain Landing as to seek relief that is demonstrably to their economic disadvantage. This seems hardly a rational position, especially when one considers the position is founded, almost exclusively, upon the selective quotation of relevant law and the selective reference of relevant documents.

### b.  Swain Landing is a Small Business

Ms. Engelhorn and White Pearl next contend that Swain Landing is not a small business, Motion, DE #25, at ¶¶ 29-36, which is puzzling insofar as such, even if true, would not be cause to dismiss this case. Notably, the Motion does *not* purport to be a challenge to Swain Landing's classification, nor does the Motion ever cite to Rule 1020. *Id.*, *passim*. So it appears Ms. Engelhorn

and White Pearl are, somehow, suggesting that (i) Swain Landing is not a small business;[3] and (ii) as a consequence of such, Swain Landing cannot reorganize in chapter 11. Both of these contentions are manifestly errant.

As a starting point, Swain Landing *is* engaged in business activity. The entity was formed to develop real estate. When the subject parcel of real estate was lost to a creditor, this case was promptly commenced to avoid the recission and regain the real estate, so as to allow the Debtor to continue its development efforts. Swain Landing remains party to a development contract with Ryan Homes, *see* Schedule G, DE #1 at p. 15, § 2.1, and is endeavoring to reorganize so as to realize the economic benefits of that contract. Just because Swain Landing lost its asset to a wayward court ruling does not mean Swain Landing ceased to be "in business." Much to the contrary, the whole point of this bankruptcy case is to allow the Debtor to continue to remain "in business" by regaining the real estate.

Perhaps cognizant of such, Ms. Engelhorn and White Pearl make much ado about the Debtor not maintaining a balance sheet or statement of profit and loss, and not filing tax returns. Motion, DE #25, at ¶ 34. In so doing, however, the movants seem to overlook that the Bankruptcy Code expressly contemplates the existence of small businesses that do not maintain such records.

---

[3] While not a point of emphasis in the Motion, Ms. Engelhorn and White Pearl do note that Swain Landing's charter has been forfeited. *See* Motion, DE #25, at Ex. B. For the avoidance of doubt, Maryland law is clear that a forfeited entity may still seek bankruptcy protection. *See, e.g.*, *In re Heark Corp.*, 18 B.R. 557, 560 (Bankr. D. Md. 1982) ("Even in a reorganization involving a corporation with a lapsed charter, collection of taxes by the state as a condition precedent to revival of the charter might be subject to the avoidance powers of Title 11.") (citing *Old Fort Improvement Co. v. Lea*, 89 F.2d 286 (4th Cir. 1937)); *Peide Yan v. Zhengang Zhang*, 2018 U.S. Dist. LEXIS 41603, at *16 (D. Md. Mar. 14, 2018) (holding a forfeited limited liability company has authority to initiate an involuntary bankruptcy case as a petitioning creditor); *Maxwell v. Mazor*, 2016 Md. App. LEXIS 747, at *18 (Md. App. Apr. 18, 2016) ("In *Price v. Upper Chesapeake Health Ventures*, 192 Md. App. 695, 995 A.2d 1054 (2010), we explained that an LLC does not cease to exist upon the forfeiture of its charter.").

9

*See* 11 U.S.C. § 1187 (directing a small business debtor to "file the documents required by subparagraphs (A) and (B) of section 1116(1) of this title"); 11 U.S.C. § 1116(1)(B) (permitting a debtor to file "a statement made under penalty of perjury that no balance sheet, statement of operations, or cash-flow statement has been prepared and no Federal tax return has been filed"). If these documents were determinative of whether or not a small business is, in fact, a small business, it would be nonsensical for the Bankruptcy Code to have a provision allowing small businesses to docket a declaration as to the non-existence of these documents.

The topical case law relied upon by Ms. Engelhorn and White Pearl is generally inapplicable to the facts *sub judice*. The movants first cite to *Nat'l Loan Inv'rs, L.P. v. Rickerson (In re Rickerson)*, 636 B.R. 416 (Bankr. W.D. Pa. 2021), an opinion concerning a doctor who (i) sold her medical practice, (ii) commenced seeing patients as a garden-variety employee of the new ownership; and then (iii) left that job, ceased seeing patients altogether, and started a new W-2 job. The debtor in that case was "only a W-2 employee of OPTUM, a company which she neither owns nor manages." *Rickerson*, 636 B.R. at 422. Suffice it to posit, Swain Landing is not a natural person, is not a W-2 employee, and has never sold its business to a third party, so Swain Landing shares little in common with the debtor in *Rickerson*.

Ms. Engelhorn and White Pearl next invoke *In re Port Arthur Steam Energy, L.P.*, 629 B.R. 233 (Bankr. S.D. Tex. 2021). This is peculiar, insofar as *Port Arthur Steam Energy* is a case where the court found that an entity managing litigation, and looking to wind up its affairs, *is* a small business, despite no longer having traditional commercial operations. There, the debtor "was not selling steam or electricity on the petition date," *id.* at 236, but was engaged in litigation, *id.* at 237, and other wind-down activities, *id.* And the court held such to be sufficient for Subchapter V

10

eligibility, going so far as to observe that a debtor may even use Subchapter V to liquidate. *Id.* at 237.

The next case cited is equally puzzling. *In re Blue*, 630 B.R. 179 (Bankr. M.D.N.C. 2021) concerns a natural person who was a full-time W-2 employee with a side hustle performing IT contracting services (read: technical support) at the rate of $50.00 per hour. *Id.* at 183. Yet the court found even that person to be sufficiently "engaged in business" as to qualify under Subchapter V. *Id.* at 188. It is not clear how *Blue* is meaningfully analogous to Swain Landing, but it is telling that the string citation of cases supposedly holding in favor of Ms. Engelhorn and White Pearl is inclusive of this particular matter, in which a court basically held that even a full-time W-2 employee is "engaged in business" so long as they are trying to profit from a side gig.

The Motion proceeds to cite to *In re Offer Space, LLC*, 629 B.R. 299 (Bankr. D. Utah 2021), a case where the debtor sold its primary asset to a third party, began winding down its affairs, and then petitioned for Subchapter V relief. *Id.* at 302. There, the court not only allowed the debtor's case to proceed but, rather relevantly, observed that there exists a meaningful divide between natural persons and businesses, for purposes of assessing Subchapter V eligibility, insofar as "because the Debtor *is the business*, it had no gap to bridge regarding its commercial or business activities." *Id.* at 311 (emphasis in original).

Aside from not actually supporting the arguments being advanced in the Motion, the topical cases relied upon by Ms. Engelhorn and White Pearl share a second commonality: they are all from 2021 or earlier. And that temporal gap is meaningful in nature. This is an area of case law that has handily developed in the past four years (which is unsurprising given the vintage of Subchapter V).

11

In 2023, the United States Bankruptcy Court for the Eastern District of New York noted that "it is important to recognize that a business need not be continuing its usual or prior business operations in order for it to be 'engaged or commercial activities.' . . . Simply put, ongoing 'business operations' are not required to open the door to Subchapter V." *In re Fama-Chiarizia*, 655 B.R. 48, 68 (Bankr. E.D.N.Y. 2023). Indeed, as observed by the *Fama-Chiarizia* Court, ". . . the substantial majority of courts that have found that a debtor may be eligible to reorganize under Subchapter V when it seeks to address residual business debt, and to marshal residual business assets." *Id.* at 69.

Also in 2023, the United States Bankruptcy Court for the Northern District of New York went even a step further, finding that the mere act of defending a state court lawsuit, related to former business activity, "is sufficient winding down activity for the Debtor to satisfy the 'engaged in commercial or business activities' requirement of § 1182(1)(A)." *In re Hillman*, 2023 Bankr. LEXIS 1448, at *9 (Bankr. N.D.N.Y. June 2, 2023).

Given that Ms. Engelhorn and White Pearl were suing Swain Landing at the time this bankruptcy case was commenced, that very litigation would be sufficient to establish Subchapter V eligibility under the *Hillman* standard. And, going a step further, the mere existence of residual debt—whether to Ms. Engelhorn, White Pearl, or two separate promissory note holders in Charles County, Maryland—would be sufficient to qualify for Subchapter V relief under the *Fama-Chiarizia* standard.

Of course, the Debtor is not looking to merely resolve litigation and wind up its affairs. To the contrary, Swain Landing is looking to avoid the loss of its real estate asset, rely on a development contract already in place, and successfully reorganize its affairs as a going concern. Yet Ms. Engelhorn and White Pearl—who, as discussed below, go to seemingly-great lengths to

12

avoid mentioning the avoidance action at the heart of this case—seem to strategically ignore these realities.

Finally, on the topic of Subchapter V eligibility, it bears notation that such is not grounds upon which to seek dismissal of this case. Even if, *arguendo*, Swain Landing was not engaged in business (and the Debtor has been unable to locate a single published opinion where a legal entity—as opposed to a natural person—has been found to not be engaged in business), the entity would remain eligible for traditional chapter 11 relief. The burden would be on Ms. Engelhorn and White Pearl to file an appropriate challenge to the designation, under Federal Rule of Bankruptcy Procedure 1020 (something they have not done, with the deadline to do so having now elapsed), and, if they were somehow successful, the Subchapter V designation would be stripped but the case would nonetheless continue.

### c.  The District of Columbia is an Appropriate Venue

The Motion proceeds to urge that this case should be dismissed because the District of Columbia is an improper venue. Motion, DE #25, at ¶¶ 37-38. This is both a manifestly errant assertion of law and a theory premised upon a fundamental refusal to recognize relevant facts. The District of Columbia is the Debtor's primary place of business, was the Debtor's primary place of business at the time this case was filed, and, per the Original Operating Agreement, has always been the Debtor's primary place of business. Yet even if, *arguendo*, another venue were more appropriate, such would not be reason to dismiss this case. And, of equal import, the movants waited far too long to assert any defect in venue in this case.

Tellingly, the Motion never actually cites or quotes the relevant venue statute. Familiarly, though, Title 28 of the United States Code allows for the filing of a case in the judicial district

where a debtor's "principal place of business in the United States, or principal assets in the United States. . ." is (are) located. 28 U.S.C. § 1408(1).

As observed by the United States Court of Appeals for the Seventh Circuit, there is a reason why the foregoing statute provides for *either* a principal place of business or a principal place of assets: the two are oftentimes not one and the same. Indeed, ". . . the 'most important, consequential, or influential' place where a corporation or partnership does its business is likely to be the place where its management decisions are made." *Granader v. Peachtree Lane Assocs. (In re Peachtree Lane Assocs.)*, 150 F.3d 788, 795 (7th Cir. 1998) (quoting *Commissioner v. Soliman*, 506 U.S. 168, 174 (1993)). Moreover, "[t]his focus on the location of the entity's primary decisionmakers is particularly appropriate, we think, in a reorganization case like this one, as such proceedings generally will involve the financial management of the debtor, rather than its day-today operations." *Granader*, 150 F.3d at 795 (citing *In re Commonwealth Oil Refin. Co.*, 596 F.2d 1239, 1246 (5th Cir. 1979); *Capitol Motor Courts v. Le Blanc Corp.*, 201 F.2d 356, 359 (2d Cir. 1953)).

At the time this case was filed, the District of Columbia was the Debtor's *only* place of business. As noted *passim*, the real estate in Charles County had been lost to a recission order; the Debtor's sole point of operation was Mr. Postal's residence in Washington. Of greater import, though, that was also the Debtor's principal place of business at all times relevant: the work of property development was being carried out by Mr. Postal from his home as he was overseeing legal, engineering, and other real estate-centric tasks. The Debtor never broke ground pre-petition, never had any employees in Maryland pre-petition, and never meaningfully operated from anywhere other than Mr. Postal's home office pre-petition. This is the reason the Original

Operating Agreement designates such as the principal place of business and this is, too, why this case is properly venued in the District of Columbia.

Further, "improper venue can be waived as it can be waived in ordinary civil litigation." *In re Shapiro*, 128 B.R. 328, 331 (Bankr. E.D.N.Y. 1991). *See also* Fed. R. Bankr. P. 1014(a) (requiring a challenge to venue be "timely" in nature). Additionally, the rule governing the transfer of venue is permissive, not mandatory; any defect in venue can be disregarded where justice and efficiency so dictate. *See In re Balt. Food Sys., Inc.*, 71 B.R. 795, 804 (Bankr. D.S.C. 1986) ("Accordingly, even if venue initially had been improperly laid in South Carolina, this court has the power and authority to retain the case under Bankruptcy Rule 1014(a)(2). . .").

Here, the Debtor has already conducted an initial debtor interview in this district, applied to employ counsel and argued such at a hearing thereupon in this district, sat for a meeting of creditors (attended by counsel for Ms. Engelhorn and White Pearl) in this district, filed and argued a banking motion in this district, filed a status report in this district, attended its status conference in this district, filed an adversary proceeding in this district, been sued by a putative creditor in this district, and drafted a soon-to-be-docketed plan of reorganization in this district. Ms. Engelhorn and White Pearl were on the original creditor matrix in this case, DE #1 at p. 27; surely, if they wished to seek a change of venue, they ought not have waited two months to do so—especially in the prism of a Subchapter V case that is designed to proceed expeditiously. *See In re Nat'l Small Bus. All.*, 642 B.R. 345, 349 (Bankr. D.D.C. 2022) (noting Subchapter V cases are designed to move expediently); *In re Wetter*, 620 B.R. 243, 251 (Bankr. W.D. Va. 2020) ("Subchapter V by its very nature is intended to be an expedited process.") (quoting *In re Seven Stars on the Hudson Corp.*, 618 B.R. 333, 346 (Bankr. S.D. Fla. 2020)).

While the temporal element of "timeliness" is assuredly somewhat subjective, it is difficult to see the Motion as being a timely challenge to venue in light of all the preceding events that have occurred. One court has observed a venue motion to be timely when filed before a meeting of creditors. *In re J.G. Robins, Inc.*, 2003 Bankr. LEXIS 990, at *5 (Bankr. N.D. Iowa Aug. 22, 2003). Even this Honorable Court—in an admittedly rather dissimilar context—has observed that the meeting of creditors appears to be the critical juncture by which venue ought to be challenged, if not outright resolved. *See, e.g.*, *In re Pickeral*, 267 B.R. 1, 3 (Bankr. D.D.C. 2001) ("The debtor had filed a motion to change venue such that the case would either be dismissed or transferred based on the improper venue. If the case were transferred, a new meeting of creditors would be held in the District of Maryland. However, her delay in addressing the question of venue in a timely fashion that would have permitted cancellation of the meeting of creditors in this district supports the court's determination that her intentional invocation of improper venue requires dismissal with prejudice.").

Again, Ms. Engelhorn and White Pearl have been on notice of this case from the outset. They dispatched counsel to the meeting of creditors. They sat idly by for nearly two months as this case progressed and as the Debtor worked toward reorganization. So even if venue were more properly laid elsewhere (which is very much not the case), it very well seems the movants have long-since waived their right to make this argument. Trying to shift a Subchapter V case, by docketing a motion that is set to be heard nearly three months post-petition, is simply not the action of a good faith creditor concerned about venue so much as the action of a putative creditor aspiring to wreak havoc upon a small business yearning to reorganize. Governing law makes clear such accordingly need not be, and should not be, countenanced.

16

Further, even if a defect in venue were to be acted upon, dismissal would not be the appropriate remedy. Rule 1014(a)(1) provides that a case filed in a proper venue, but more appropriately heard in a different venue, may (not "shall") be transferred. Fed. R. Bankr. P. 1014(a)(1). The same rule provides that an improperly venued case may (also not "shall") be transferred or dismissed. Fed. R. Bankr. P. 1014(a)(2). The determining criteria is "the interest of justice and convenience of the parties." *In re Lakeway Int'l, L.L.C.*, 2001 Bankr. LEXIS 2148, at *5 (Bankr. D. Neb. Mar. 19, 2001).

Here, it has now been more than 90 days since the Debtor lost its real estate asset to an order of recission. Dismissing this case would, accordingly, create a paradigm where Swain Landing's avoidance action would be gravely endangered. Transferring this case, however, would ensure the subject action proceed (albeit with palpable disruption, enormous added expense, and inequitable delay). So while the Debtor vehemently urges that venue is proper in this Honorable Court, that Ms. Engelhorn and White Pearl have waived their right to challenge venue, and that the attack on venue appears to be a pretextual effort to simply harass the Debtor as part of a scorched earth litigation strategy, the Debtor equally suggests that if this Honorable Court were to find cause to take action based upon venue, the appropriate remedy is one of transfer and not dismissal.

### d.  A Good Faith, Bankruptcy-Centric Reason Drives the Effort to Reorganize

The movants' final suggested cause for dismissal is bad faith, with Ms. Engelhorn and White Pearl reiterating their counterfactual and legally errant assertions concerning authority to seek bankruptcy protection, Motion, DE #25, at ¶ 40, then protesting that this case was filed "to disrupt the entire Civil Court Action," *id.* at ¶ 41, before insisting "Movants understand that one of the codefendants, either directly or through an affiliate, is financing this bankruptcy case," *id.*

17

at ¶ 42. Allegations of bad faith ought not be bandied about lightly. Yet, here, the allegations are all-the-more concerning considering (i) the Debtor did have proper authority to file, *see, supra,* § II(a); (ii) the movants seem to be intentionally ignoring the avoidance-centric rationale for this case; and (iii) assuredly neither Ms. Engelhorn nor White Pearl are truly troubled that an entity with no cash on hand relied on the non-recourse generosity of an insider's affiliate to pay the retainer of reorganization counsel.

As to authority to file, the Debtor will refrain from restating the salient points and arguments. Rather, Swain Landing incorporates, by reference, the discussion set forth in Section II(a) above.

Concerning Swain Landing's motivation to file: it is astonishing that neither the word "avoidance" nor any conjugated iteration of "avoid" appears so much as once in a 16-page motion. The Debtor's schedules highlight the intent to file an avoidance action to reclaim lost real estate. *See* DE #1 at p. 10, § 55. The avoidable-recission is then mentioned—twice—on the statement of financial affairs. *Id.* at p. 18, §§ 3.1; 5. The avoidance action itself was filed less than a week after the Debtor sought bankruptcy protection. DE #14. The avoidance action was then discussed, in detail, in the Debtor's status report. DE #22. And it thusly strikes as deeply suspect that Ms. Engelhorn and White Pearl are insisting this bankruptcy was filed to interfere with their litigation and not, as would be seemingly apparent from all of the foregoing, to regain property lost to recission.

It also remains rather unclear how the Debtor has substantially interfered with the movants' litigation. Yes, Swain Landing elected to remove the litigation and to then immediately seek a transfer of venue to this Honorable Court. But if the movants had not opposed the transfer of venue (an opposition that appears to defy decades of well-settled case law), the case—including their

remand motion—would already be pending in this Honorable Court. In fact, in light of the scheduling mechanisms of this Honorable Court, the movants' remand motion likely already would have been heard if they did not elect to try to stymie a common sense change of venue.

Perhaps Ms. Engelhorn and White Pearl do not believe a federal court can grasp the complexities of their claims. Perhaps the movants suffer concerns about adhering to the Federal Rules of Civil Procedure incorporated into Title VII of the Federal Rules of Bankruptcy Procedure. Though these both seem at-best remote possibilities; the sophistication of this Honorable Court is rarely questioned and the applicable rules do not meaningfully differ from the Maryland Rules. Nor does there appear to be any circuit-level divide in holdings that would render the movants' claims any more or less likely to succeed in the District of Columbia Circuit than in the Fourth Circuit.

Thus, to the extent Ms. Engelhorn and White Pearl suggest their case to have suffered undue disruption by this bankruptcy, they perhaps ought to focus more introspectively. Swain Landing is trying to avoid the loss of its real estate asset and finds itself needing to contend with the claims of Ms. Engelhorn and White Pearl as part of its reorganization. Assuredly, in electing to sue Swain Landing—after electing to discontinue the provision of funding to Swain Landing— the movants knew this precise situation may well come to pass. And it is thusly difficult to credit their allegation of bad faith as being well-moored to fact or law.

Similarly unmoored is the broadside in which the Motion scandalously asserts, *inter alia*, "Movants understand that one of the codefendants, either directly or through an affiliate, is financing this bankruptcy case." Motion, DE #25, at ¶ 42 (citing Exhibit C thereto). Putting aside that nothing in Exhibit C to the Motion so much as touches upon this, the contention is at-best strange. Swain Landing disclosed, in its statement of financial affairs, the source of the retainer

paid to undersigned counsel. *See* DE #1 at p. 19, § 11.1. So, too, did undersigned counsel make the disclosure in his Rule 2016 filing. *Id.* at p. 25. The disclosure is precise in indicating that while the retainer was paid by a third party, all future compensation will come from the Debtor. *Id.*

This is not an unusual construct. Small business debtors often rely on the generosity of insiders and related entities to pay the pre-petition retainer of their reorganization counsel. Sometimes outsiders even agree to be bound to pay subsequent fees; so as to avoid even the appearance of a conflict of interest, however, undersigned counsel did not make such a request in this case (nor has undersigned counsel done so in any of the other debtor-side cases he has managed in this Honorable Court, the District of North Dakota, the District of Maryland, the Eastern District of Virginia, or various other bankruptcy courts).

### e. Removal was Proper

Finally, a side note of some merit: the movants bemoan in their Motion—as they have now similarly (albeit not identically) noted in a related filing in the removed litigation to which they are parties—that the state court litigation was removed "without an underlying Maryland Bankruptcy case." Motion, DE #25, at p. 3. Swain Landing struggles to appreciate why Ms. Engelhorn and White Pearl believe this observation to be of any relevance whatsoever.

As noted in the motion to transfer venue, "[t]he above captioned case has been removed to this Honorable Court pursuant to the strictures of Section 1452(a) of Title 28 of the United States Code, since the underlying state court litigation was pending in Maryland." *Engelhorn, et al. v. Bolog, et al.*, Case No. 25-159 (Bankr. D. Md. 2025) at DE #2, p. 1.

Plainly, Title 28 requires a case be removed "to the district court for the district where such civil action is pending. . ." 28 U.S.C. § 1452(a). Removal to any other district court (or bankruptcy court, by virtue of a standing order of referral) would be jurisdictionally improper. And if removal

was to be had to the United States District Court for the District of Maryland, that venue—much like the United States District Court for the District of Columbia—has a local rule referring bankruptcy-related matters to the bankruptcy judges of that Honorable Court. *See* United States District Court for the District of Maryland Local Rule 402 ("Pursuant to 28 U.S.C. § 157(a), all cases under Title 11 of the United States Code and proceedings arising under Title 11 or arising in or related to cases under Title 11 shall be deemed to be referred to the bankruptcy judges of this District."). Hence the removal to the bankruptcy court sitting in Baltimore and hence the near-simultaneous docketing of a motion to transfer venue.

It is unclear why this is mentioned in the Motion, and there is no cognizable follow-up on the introductory remark of the movants. But to the extent this is intended to buttress arguments for dismissal, such seems little more than yet another unfortunate aside in a motion too often reliant on misstatements of fact and law alike.

### III.    Conclusion

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) deny the Motion; and (ii) afford such other and further relief as may be just and proper.

*[Signature and Certificate of Service on Following Page]*

21

Respectfully submitted,

Dated: July 14, 2025          By:     /s/ Maurice B. VerStandig
                                      Maurice B. VerStandig, Esq.
                                      Bar No. MD18071
                                      The Belmont Firm
                                      1050 Connecticut Avenue, NW
                                      Suite 500
                                      Washington, DC 20036
                                      Phone: (202) 991-1101
                                      mac@dcbankruptcy.com
                                      *Counsel for the Debtor*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of July, 2025, a copy of the foregoing was served electronically upon filing via the ECF system, with copies being sent to all parties receiving electronic notice herein.

/s/ Maurice B. VerStandig
Maurice B. VerStandig