Maurice B. VerStandig, Esq.
THE BELMONT FIRM
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
mac@dcbankruptcy.com
*Counsel for the Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 25-184-ELG |
| Swain Landing LaPlata JC, LLC ) | |
| ) | |
| Debtor. ) | |
| ) | |

**SWAIN LANDING LAPLATA JC, LLC'S**
**SUBCHAPTER V PLAN OF REORGANIZATION**

Comes now Swain Landing LaPlata JC, LLC ("Swain Landing" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A, and provides the following plan of reorganization (the "Plan"):

**Background for Cases Filed Under Subchapter V**

a. **Description and History of the Debtor's Business**

Created for the express purpose of acquiring and developing a parcel of real estate in Charles County, Maryland, the Debtor filed articles of organization—and thusly came into formal existence—on January 4, 2022. At the time of the company's creation, the sole two members thereof were Michael Postal ("Mr. Postal") and Anjon Jones ("Mr. Jones"). Two days later, however, White Pearl, LLC ("White Pearl") bought into Swain Landing, becoming the third member, with Mr. Jones' membership subsequently being transferred to a related, insider entity.[1]

---

[1] It appears White Pearl may dispute being a member of the Debtor, having filed a lawsuit in which White Pearl alleges that nothing "of value" was obtained "in return for White Pearl, LLC" making a monetary contribution to Swain Landing. The Debtor finds this position puzzling. However, if White Pearl wishes to assert that it is not an equity holder of the Debtor and is, rather, merely the holder of an unsecured claim premised upon a loan without any correlative promissory note, such is certainly White Pearl's prerogative. As discussed *infra*, this Plan provides a mechanism for disputing claims. As of the filing of this Plan, White Pearl has not filed a claim. Should there come a time when White Pearl does file a claim, the same will be addressed in accord with the provisions of this Plan and governing law. Unless and until such a claim is docketed, however, White Pearl will continue to be treated as an equity holder of the Debtor that acquired an interest in Swain Landing two days following the formation and creation of Swain Landing.

On January 6, 2022, Swain Landing closed on the acquisition of the parcel of real estate commonly known as 10524 La Plata Road, La Plata, Maryland 20646 (the "Real Estate"). The Real Estate was purchased from Catherine Swain ("Ms. Swain") and Percy Swain ("Mr. Swain") for $1,500,000.00. The Debtor tendered an earnest money deposit of $105,000.00 and then delivered an additional $314,711.73 at closing. Net of closing costs and related transaction expenses, this left a debt of $1,200,000.00, which was memorialized by a seller financing note in favor of Ms. Swain and Mr. Swain (the "Swain Note"), with Swain Landing obligated thereupon and the Real Estate pledged as security for the indebtedness.

Several months later, the Debtor entered into a lot purchase agreement with NVR, Inc. d/b/a Ryan Homes ("Ryan Homes"). Pursuant to that agreement, Swain Landing will undertake the basic development of the Real Estate (including providing onsite paving), after which Ryan Homes will purchase at least 83 lots (and, likely, many more) from Swain Landing, commencing with four or fewer lots to be used for construction of model homes and followed by an acquisition of not less than fifteen lots every calendar quarter until all lots have been sold.

Palpable dispute encompasses what came next. The Debtor had expected White Pearl—an entity controlled by Claudia Engelhorn ("Ms. Engelhorn"), the daughter of a German billionaire—to furnish additional capital to the development of the Real Estate, so as to move closer to substantial consummation of the agreement with Ryan Homes. No such subsequent capital infusions were forthcoming, however. And, whatever the reason for the sudden cessation of funding, such left Swain Landing in the precarious position of incurring ongoing engineering, development and legal fees, whilst attempting to stay current on the Swain Note, without any new influx of monies.

In due course, the Debtor defaulted on the Swain Note. Ms. Swain and Mr. Swain, in turn, brought suit in Charles County, Maryland, premised upon a breach of contract, apparently seeking a recission of the Real Estate sale. Swain Landing is not certain if it was ever properly served with process in that suit but is well aware that the entity did not actively participate in the litigation and, ultimately, suffered entry of a judgment of recission on or about March 19, 2025 (the "Recission Judgment").

The Recission Judgment did not provide for a return of Swain Landing's payments to Ms. Swain and Mr. Swain. And myriad hornbook anomalies appear to encompass the Recission Judgment. Nonetheless, on or about April 8, 2025, the Recission Judgment was recorded amongst the land records of Charles County, Maryland, thereby transferring ownership of the Real Estate back to Ms. Swain and Mr. Swain.

One month and one week later, the Debtor elected to petition for chapter 11 relief in this Honorable Court. Transparently, the guiding goal of this Subchapter V case has been to bring suit against Ms. Swain and Mr. Swain so as to avoid entry of the Recission Judgment. Equally, however, the Debtor has seen this case as an opportunity to reorganize its financial affairs, to liquidate any obligations owed to White Pearl, Ms. Swain and/or Mr. Swain, and to establish a framework for the development of the Real Estate to the point requisite to commence—and, ultimately, conclude—closing on the sale of lots to Ryan Homes.

### b. Liquidation Analysis & Secured Claim Valuation

To confirm the Plan, this Honorable Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. The Debtor entered bankruptcy with $0.00 in assets. There are, quite literally, no pre-petition assets—whatsoever—that a trustee could liquidate for distribution to creditors.

In a chapter 7 liquidation, however, a trustee could pursue the same avoidance action against Ms. Swain and Mr. Swain that is now being pursed by the Debtor. There exists a substantial likelihood a trustee would be successful pursuing this litigation and, as such, that a trustee would be able to recover the Real Estate, with an approximately value of $1,500,000.00.

While the pertinent analysis is, admittedly, exceedingly complicated, it appears that the Real Estate, once recovered by the Debtor's estate, will be free and clear of all liens. Since Ms. Swain and Mr. Swain opted to pursue a recission of the sale of the Real Estate, as opposed to a foreclosure of the deed of trust, there is no foreclosure to be avoided (and, as such, no deed of trust to be restored through avoidance of its foreclosure).

Stated otherwise, since Mr. Swain and Ms. Swain did not foreclose the deed of trust in taking back the Real Estate, a judgment of avoidance will not result in the undoing of a deed of trust's foreclosure. Rather, Ms. Swain and Mr. Swain elected to seek rescission, thereby keeping the deed of trust intact. All of which may appear to have been a fancy trick to avoid the costs and expenses of a foreclosure, but which now has an unusual ramification.

Specifically, Mr. Swain and Ms. Swain were (and, as of the filing of this Plan, still are) the concurrent holders of (i) title to the Real Estate; and (ii) the unforeclosed deed of trust. Under applicable law, this occurrence results in the deed of trust merging into ownership of the Real Estate upon the filing of the state court judgment in the land records of Charles County, Maryland. *See, e.g.*, *Gould v. Day*, 94 U.S. 405, 413 (1876) ("This union of conflicting interests operated to merge the lesser interest in the greater, the lien in the title. One cannot have a lien upon his own property, except where equity interposes, and, to prevent a failure of justice, keeps the lien outstanding; and here there was no interference of equity, and no occasion for its interference. The rule of law took effect at once, and the State lien was *eo instante* merged in the plaintiff's general title.").

Success in the avoidance action will, no doubt, result in Ms. Swain and Mr. Swain being restored to their status as holders of the Swain Note. But avoidance of the recission will not change that the deed of trust has now been destroyed by merger. This is, no doubt, one of the many reasons people generally foreclose deeds of trust and do not try to cut corners by seeking recission. And this will create a paradigm, *sub judice*, where Ms. Swain and Mr. Swain, as noteholders, will be unsecured creditors in this bankruptcy case, once the avoidance action results in a judgment in favor of the Debtor (or a hypothetical chapter 7 trustee).

So a chapter 7 trustee would have a parcel of property, worth $1,500,000.00, to sell for the benefit of creditors. A sale of the property in chapter 7—which does not provide an exemption from state taxes—would likely result in $118,327.88 in settlement charges (being the same number as when the Real Estate was purchased from Mr. Swain and Ms. Swain), $1,383.85 in county taxes

(also the same figure as the last sale), and realtor commissions of $75,000.00 (being 5% of the gross sales price). These costs and fees would lead to a net sales receipt of $1,305,288.27.

A trustee would be entitled to a commission of $62,408.65 on such a distribution, leaving $1,242,879.62 to be disbursed to creditors.[2]

This Plan, by contrast, will pay *at least* the lesser of (i) approximately $5,920,621.00 or (ii) all allowed claims, in full.

   c. **Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments. Forward-looking financial projections for the Debtor are attached hereto as **Exhibit A**. These figures show that the Debtor will have projected disposable income (as defined in § 1191(d) of the Bankruptcy Code), remaining after the payment of administrative expenses addressed below, for the period in § 1191(c)(2).

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.     Summary**

This Plan under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

| The Plan provides for: | 1 class of non-priority, unsecured claims; and |
| | 1 class of equity holders. |

The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.     Classification of Claims and Interests**

**Section 2.01   Class 1**           All general unsecured creditors

**Section 2.02   Class 2**           The Debtor's equity interests.

---

[2] Payment of the claims of administrative creditors—including counsel for a trustee—are included in this number. While the Debtor believes chapter 11 counsel may be able to operate more economically nimbly than would counsel for a chapter 7 trustee, Swain Landing does not presently rely on such in light of the gross disparity between what a chapter 7 liquidation would fetch and what this Plan will pay to creditors.

**Article 3.**  **Treatment of Administrative Expense Claims and Court Costs**

| | | |
|---|---|---|
| **Section 3.01** | **Unclassified Claims** | Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes. |
| **Section 3.02** | **Administrative Expense Claims** | Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code will be paid in full upon such other terms as may be agreed upon by the holder of the claim and the Debtor or, absent agreement, during the life of the Plan, pursuant to Section 1191(e) of the Bankruptcy Code. All professionals. including the Debtor's counsel and the Subchapter V Trustee, will need to file applications with the Court to seek approval of their fee and expenses as allowed administrative expense claims within 30 days of the Effective Date. |
| **Section 3.03** | **Priority Tax Claims** | Each holder of a priority tax claim will be paid in full not later than May 14, 2030. It is reasonably believed that no such claims exist in this case. |
| **Section 3.04** | **Statutory Fees** | There are no statutory fees due in this case. |
| **Section 3.05** | **Prospective Quarterly Fees** | There are no prospective quarterly fees that will be due in this case. |

**Article 4.**  **Treatment of Claims and Interest Under the Plan**

| **Class** | **Impairment** | **Treatment** |
|---|---|---|
| Class 1 – General Unsecured Creditors | Impaired | Class 1 consists of all general unsecured claims that are allowed claims. As of the filing of this Plan, there appear to be three putative creditors, the claim of only one of which is undisputed by the Debtor. The claims, *vel non*, of each of these three putative creditors are discussed in Section 4.01, *infra*. |
| Class 2 – Equity Interests | Unimpaired | The equity interests of the Debtor shall retain their membership in Swain Landing though the Debtor may, as discussed in greater detail in Article 7, *infra*, sell equity, postr- |

5

confirmation, so as to raise funds to complete development. Should such a sale occur, the Debtor's extant equity interests will be diluted *pari passu*.

**Section 4.01   Class 1 Claimants**

There are three known creditors who at least purport to hold claims that, if allowed, are treated as part of Class 1 herein: (i) Ms. Swain and Mr. Swain; (ii) White Pearl; and (iii) Erik Bolog.

The claims of Ms. Swain and Mr. Swain have been scheduled as disputed because of the state court recission judgment. However, assuming the recission is avoided by this Honorable Court, the Debtor will regard Ms. Swain and Mr. Swain as holding a claim for $1,000,000.00, being the Debtor's best faith estimate of the amount of the Swain Note less payments made thereupon. Should Mr. and Ms. Swain timely file a claim in this action, in a different amount, the Debtor will assess whether or not to object to the same pursuant to the allowances of Article 5 hereof. *For the avoidance of doubt, the Debtor will afford Ms. Swain and Mr. Swain the treatment set forth in this Section 4.01 even if those parties do not ultimately file a proof of claim. Treating those parties as having no claim whatsoever, whilst nonetheless avoiding the recission of their former collateral, would be so wildly inequitable as to shock the conscience and the Debtor will neither attempt nor countenance such.*

The claim of White Pearl is the subject of litigation commenced in state court and since removed to the United States Bankruptcy Court for the District of Maryland, in which a motion to transfer venue has been filed, and remains pending, as of the filing of this Plan. The Debtor vehemently disputes owing any monies to White Pearl. This claim appears to be an effort to transmute the position of an equity holder into that of a debt holder. Swain Landing does not feign to fully understand the legal rationale behind this claim and is deeply suspicious of the veracity of this claim. Swain Landing does, however, respect and appreciate that White Pearl will be afforded an opportunity to prosecute this claim.

For the avoidance of doubt or ambiguity, however, Swain Landing does *not* consent to the prosecution of the White Pearl claim in any court other than this Honorable Court. The Debtor is entitled to the protections set forth by the Supreme Court in the case of *Barton v. Barbour*, 104 U.S. 126 (1881) and will invoke those protections.

The final Class 1 constituent is Erik Bolog ("Mr. Bolog"), who has filed an adversary proceeding against Swain Landing for indemnity and contribution. Mr. Bolog therein asserts that he is Swain Landing's co-defendant in the litigation commenced by White Pearl (alongside Ms. Engelhorn in her individual capacity and her capacity as a trustee) and that if he is found to be liable to any plaintiff therein, the Debtor should, in turn, be made to indemnify Mr. Bolog for such liability and/or contribute to the satisfaction of any such judgment. Swain Landing is in the process of investigating this claim and will defend it in due course. However, to the extent, *vel non*, that Swain Landing is ultimately adjudged to be liable to Mr. Bolog, based on any liability of Mr.

6

Bolog to White Pearl and/or Ms. Engelhorn, such shall be treated as a general unsecured claim comprising a part of Class 1.

**Section 4.02   Class 2 Equity Holders**

The Debtor's Class 2 equity holders are (i) Mr. Postal; (ii) POJO LaPlata LLC; and (iii) White Pearl. Each such equity holder shall retain its ownership interest as reflected on statement of financial affairs, DE #1 at p. 22, § 28, filed by Swain Landing. However, should White Pearl succeed in litigation that contends that entity's capital contribution to, instead, have been a debt offering, the equity composition of Swain Landing will be adjusted in accord with said judgment. As noted in Article 4, *supra*, the equity positions of these parties may be diluted, *pari passu*, post-confirmation, to the extent reasonably necessary to raise funds to complete development of the Real Estate.

**Article 5.   Allowance and Disallowance of Claims**

**Section 5.01   Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated; or (iii) said claim is identified as disputed in Section 5.04 hereof.

**Section 5.02   Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03   Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04   Anticipated Disputed Claims**. As noted *supra*, the Debtor disputes the claims of White Pearl and Mr. Bolog. The Debtor reserves its right to dispute any other claim, by the filing of a formal objection thereto, at any time to and through the one year anniversary of the Effective Date.

**Article 6.   Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01   Assumption / Tax Free Sales.** The Debtor assumes the executory contract with Ryan Homes, as listed on Line 2.1 of Schedule G. Insofar as the contract is being assumed pursuant to this Plan, and insofar as the sales provided for therein will occur pursuant to this Plan, the subject sales shall be made without the payment of taxes thereupon. 11 U.S.C. § 1146(a).

**Section 6.02   Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof, with it being reasonably believed no other such executory contracts or unexpired leases are extant.

**Article 7.        Means for Implementation of the Plan**

The success of this Plan is premised upon the Debtor succeeding in the currently-pending avoidance action against Ms. Swain and Mr. Swain. Should the Debtor not succeed in that litigation, the Debtor will consent to the conversion of this case to a proceeding under chapter 7 of the Bankruptcy Code.

Assuming the Debtor succeeds in the avoidance action against Mr. Swain and Ms. Swain, the Debtor will utilize commercially reasonable efforts to raise funds with which to continue development of the Real Estate. Swain Landing believes the most likely avenue of such will be through the investment of new equity-level capital, thereby diluting the positions of current equity holders. However, Swain Landing is also prepared to incur debt—including debt secured by the Real Estate—if the capital market does not prove ultimately availing.

The Real Estate shall remain an asset of the Debtor's estate, post-confirmation, until the earlier of (i) five years from the Effective Date; or (ii) such a time as development thereof is substantially completed. Importantly, this will allow the Debtor to petition this Honorable Court, pursuant to the allowances of Section 364(d) of the Bankruptcy Code, to allow debt financing to be secured by a lien senior to that of the one held by Mr. Swain and Ms. Swain if the Debtor is unsuccessful in arguing the lien of Mr. Swain and Ms. Swain to have merged into the Real Estate. (The Debtor does not doubt that it will be successful in making this argument, should the need so-arise—and the claim of Ms. Swain and Mr. Swain is regarded as a general unsecured claim hereunder in any event—but the Debtor inserts this proviso out of an abundance of caution.) Further, any debt incurred post-confirmation shall be paid *prior* to allowed claims herein, pursuant to the allowances of Section 364(b-c) of the Bankruptcy Code.

While it is regrettable that White Pearl has elected to cease funding development of the Real Estate, Mr. Postal maintains a healthy array of connections in the real estate development community and, as such, is confident he will be able to procure an appropriate equity or debt partner to contribute funds to complete development of the Real Estate. Moreover, given the exceedingly healthy margins that will be earned through development of the Real Estate, Swain Landing can procure private financing (a so-called "hard money loan") should other avenues prove unsuccessful. Given that Swain Landing has already procured the Real Estate, and has already invested certain funds into developing the Real Estate, the prevailing nature of local market conditions is such that there will exist an acceptable loan-to-value ratio with which to obtain credit if the need should arise. The Debtor maintains a preference for equity financing but also recognizes a need to promptly reorganize in Subchapter V and to thusly allow for different contingencies. At irreducible minimum, a private financing option will be feasible; Swain Landing is merely cautiously optimistic that a more economically beneficial form of financing will, too, prove feasible.

The timeline for development of the Real Estate is expected to run five years from the Effective Date. The expenses and revenues projected by the Debtor during that time period—excluding any debt service if debt financing becomes necessary in the absence of equity financing—is reflected on **Exhibit A** hereto.

8

**Article 8.    General Provisions**

**Section 8.01    Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02    Effective Date.** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

**Section 8.03    Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04    Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05    Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code), as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan.

**Section 8.06    Disbursing Agent.** There shall be no disbursing agent hereunder and the Debtor will make all payments to creditors directly, by check or, where available, direct deposit or auto-debit.

**Section 8.07    Time for Payment.** The Debtor will pay Class 1 claimants, *pari passu*, as soon as practicable but in no event (i) later than the fifth anniversary of the Effective Date; or (ii) sooner than adjudication of any claim objections asserted and/or or adversary claims being asserted against the Debtor as and for pre-petition conduct or obligations. Such payment(s) will be made in one or more tranches, as the Debtor deems fit in its business judgment, *provided* the Debtor shall be bound to disburse all monies to the retirement of claims, within thirty (30) days, if (a) the Debtor holds funds in excess of $10,000.00; and (ii) the Debtor does not reasonably anticipate needing to

expend said funds in furtherance of the development of the Real Estate.[3] Professional and administrative claims will be paid as soon as cash is available to retire the same (subject to the same caveat regarding need for development purposes) and will be paid, in full, before any distribution is made to Class 1 claimants.

**Section 8.08   Captions.** The headings contained in this Plan are for convenience of reference only, and do not affect the meaning or interpretation of this Plan.

**Section 8.09   Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the District of Columbia govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.10   Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder. Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such time as said class is paid in full; (ii) second paid to each junior class (if any), until all classes are paid in full; and (iii) then, if and when each class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono* services to persons in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law.

**Section 8.11   Retention of Jurisdiction.** The United States Bankruptcy Court for the District of Columbia shall retain jurisdiction of this chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

---

[3] "Development of the Real Estate" includes (i) the payment of post-confirmation engineering fees; (ii) the payment of post-confirmation architectural fees; (iii) the payment of post-confirmation construction costs; (iv) the payment of post-confirmation legal fees; (v) the payment of real estate taxes; and (vi) the payment of other obligations reasonably attendant to the development of the Real Estate. "Development of the Real Estate" does not include the payment of any monies, as a salary, to any insider of the Debtor.

**Section 8.12    Modifications.** Modification of this Plan shall be governed by Section 1193 of the Bankruptcy Code.

**Section 8.13    Professional Fees.** Per Section 3.02 of this Plan, the Debtor must seek the approval of this Honorable Court prior to paying any professional fees incurred during the pendency of this case. Commencing on the Effective Date, however, the Debtor shall be free to pay any post-confirmation fees incurred by the Subchapter V trustee, counsel, or other professionals, without first obtaining leave of court, and such professionals shall thereafter be excused from any requirement to seek leave of court.

**Article 9.    Discharge**

**Section 9.01    Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

(a) If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the effective date of the Plan; or

(b) If the Plan is confirmed under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of the plan payments being made in the 60th month succeeding the Effective Date.

**Section 9.02    Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Section 9.03    Notice of Substantial Consummation.** If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

**Section 9.04    Retention of Real Estate, Fees Claim and Costs Claim.** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, (i) the Real Estate; (ii) any claim against White Pearl or Mr. Bolog for legal fees or costs of litigation, (iii) any litigation claim against White Pearl or any insider thereof, related to the discontinuance of the provision of funding to the Debtor; and (iv) all claims against Mr. Swain and Ms. Swain, shall remain assets of the Debtor's bankruptcy estate—and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code—to and through the fifth anniversary of the Effective Date, at which time said interest (should any remain) shall revest in the Debtor, *except* the Debtor shall not require leave of this Honorable Court to sell the Real Estate in accord with the provisions of this Plan.

*[Signature on Following Page]*

Respectfully Submitted,

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
THE BELMONT FIRM
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
mac@dcbankruptcy.com
*Counsel for the Debtor*