Sam J. Alberts (DC Bar # 443260)
David F. Cook (DC Bar #1708239)
DENTONS US LLP
1900 K Street, NW
Washington, DC 20006
Tel: (202) 408-7004
Email: sam.alberts@dentons.com

Elysa Chew (*pro hac vice* motion to be filed)
DENTONS US LLP
233 S. Wacker Drive, #5900
Chicago, IL 60606
Tel: (312) 876-8000
Email: elysa.chew@dentons.com

Wes P. Henderson, Esq. (DC Bar #502935)
Patrick D. Gardiner, Esq. (DC Bar #1630864)
HENDERSON LAW, LLC
2127 Espey Court, Suite 204
Crofton, Maryland 21114
T: (410) 721-1979
F: (410) 721-2258
Email: wph@hendersonlawllc.com
Email:  patrick@hendersonlawllc.com

*Co-Counsel for Claudia Engelhorn, Individually and on behalf of the Whitewater Revocable*
*Trust, and White Pearl, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re:<br><br>Swain Landing LaPlata JC, LLC<br><br>　　　　Debtor. | Case No. 25-184-ELG<br><br>Chapter 11<br><br>Related to Docket Nos. 25 and 31 |

### REPLY IN SUPPORT OF THE MOTION TO DISMISS THE BANKRUPTCY CASE

Creditors and parties in interest, Claudia Engelhorn ("Ms. Engelhorn"), individually and

as Trustee of the Whitewater Revocable Trust dated September 30, 2021, as amended (the

"Trust"), and White Pearl, LLC ("White Pearl", and, together with Ms. Engelhorn and the Trust,

"Movants"), by and through undersigned counsel, file this reply (this "Reply") in support of their

*Motion to Dismiss Bankruptcy Case* [Docket No. 25] (the "Motion to Dismiss") and in response

to the Swain Landing LaPlata JC, LLC's ("Swain Landing" or the "Debtor") *Opposition to Motion*

*to Dismiss the Bankruptcy Case* [Docket No. 31] (the "Opposition").[1] In support, Movants state as follows:

## PRELIMINARY STATEMENT

The Opposition labels Ms. Engelhorn a "Kamikaze," with no valid reason to seek dismissal of this bankruptcy case. This characterization is insulting, unwarranted, and belied by the law and facts that support the relief that she and her co-Movants rightfully seek.

Ms. Engelhorn, through her wholly owned co-Movant investment entities, provided $585,000.00 (the "Contribution") for a 50% membership interest in Swain Landing, a business "opportunity" introduced to her by her former attorney and advisor Erik Bolog. The Contribution was made within two days of the Debtor's incorporation on January 4, 2022, and allowed Swain Landing to acquire its only asset, an interest in real property in Maryland. The Contribution totals more than nine times the amount of the combined monetary contribution of the Debtor's other two members: (i) Mr. Postal (20%), the manager who allegedly contributed $65,000.00; and (ii) POJO La Plata LLC *via* Anjon Jones (30%), which contributed no money.[2]

Notwithstanding the Contribution and the Movants' plurality membership interest, Mr. Postal did not consult with the Movants or obtain their written consent to file this bankruptcy case. To the contrary, the petition was filed on Mr. Postal's sole instruction along with a separate adversary proceeding in the United States Bankruptcy Court for the District of Maryland (the "Maryland Adversary Proceeding") to disrupt and transfer the 2024 action filed by Movants

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion to Dismiss or the Opposition, as applicable.

[2] *See* Unsigned Operating Agreement, attached hereto as **Exhibit B**, Capital Contribution and Percentage Interest of Members.

against him, Mr. Bolog, and others (the "Civil Court Action") in the Circuit Court for Baltimore

City, Maryland (the "Circuit Court").[3]

In response, the Debtor contends that Mr. Postal was authorized to file this bankruptcy case

under the terms of a previously undisclosed operating agreement between he and the other minority

limited liability company member Anjon Jones (the "Original" Operating Agreement," attached

hereto **Exhibit A**) or, alternatively, an operating agreement that listed the Movants but which

Movants refused to sign (the "Unsigned Operating Agreement," attached hereto as **Exhibit B** and

referred to collectively with the "Original" Operating Agreement as the "Operating Agreements").

The Debtor's position is without merit as neither Operating Agreement was signed or approved by

Movants. The Opposition does not allege that Movants received a copy of the "Original" Operating

Agreement; in fact, upon information and belief, such agreement was never presented to Movants

for review. Thus, Movants are not bound by either Operating Agreement and the Debtor did not

have authority to file the bankruptcy petition. And, even assuming, *arguendo*, these agreements

were otherwise lawful, their terms do not authorize Mr. Postal to place Swain Landing into

bankruptcy and this case should be dismissed.

Dismissal is also warranted because the Debtor was not doing business at or near the time

of the bankruptcy filing. Nor could it lawfully do so as it had been forfeited by the State of

Maryland more than 180 days prior to the Petition Date. Swain Landing was so dormant that it did

not appear or in any way oppose the action brought by the Swains that resulted in the loss of its

one asset, interest in Maryland real property. Such facts further defeat the Debtor's assertion of

---

[3] As set forth in more detail in herein, the Civil Court Action seeks monetary and nonmonetary relief based on improper and fraudulent conduct that resulted in more than $10 million in harm to Ms. Engelhorn, of which Swain Landing is a piece.

corporate authority, nullify its subchapter V eligibility, and rebut its assertion of proper venue in the District of Columbia.

The Debtor's assertion of a theoretically legitimate bankruptcy purpose — to pursue an avoidance action against the Swains — is at best suspect, and, even if true, unavailing.[4] In connection with this bankruptcy case, the Debtor filed the Maryland Adversary Proceeding to remove and transfer to this Court the Civil Court Action.[5] Tellingly, the Debtor's efforts in the Maryland Adversary Proceeding are supported by the Bolog Defendants. In contrast, the entities with the most to gain from any avoidance action brought by Swain Landing against the Swains are the Movants, who do not want the bankruptcy case to proceed, particularly at the expense of advancing the Civil Court Action in the Circuit Court. That is because the Movants assert that the Bolog Parties wrongfully utilized monies from White Pearl to invest in the Debtor, an entity partially owned by Erik Bolog's long-time friend and/or business associate, Michael Postal.[6]

Accordingly, the Movants filed the Motion to Dismiss not out of irrationality or ire, but for sound reasons. For some reason, the Debtor seems to suggest that the Movants are the wrongdoers, yet they are the ones who have collectively lost over $10,000,000.00 due to the actions of the Defendants (as alleged in the Civil Court Action). Meanwhile, Mr. Postal allegedly contributed $65,000.00 (the Movants have not seen written proof of this assertion).  In any event, this Court

---

[4] Notably, the Debtor suggests that a claim may lie against the Movants for failing to contribute more. Opposition at 19. In addition to having no legal merit, such a suggestion undermines the Debtor's claim of honest motive and further evidences bad faith.

[5] The Civil Court Action and Ms. Engelhorn's history with Swain Landing, Mr. Postal, and Mr. Bolog (who introduced Ms. Engelhorn to the Swain Landing project) is laid out in additional detail in the Amended Complaint, attached to the Motion to Dismiss as Exhibit E, which is incorporated by reference herein.

[6] This Honorable Court may take judicial notice of the fact that Messrs. Bolog and Postal were sued in this Honorable Court by the Law Offices of William Johnson approximately *16 years ago*. See Law Offices of William Johnson v. M Y New Hampshire, LLC et al., Case No. 09-10047-SMT.

should dismiss the bankruptcy case based on: (i) a lack of corporate authority to file; (ii) ineligibility under subchapter V; (iii) improper venue; and (iv) bad faith.

## BACKGROUND

Although much of the relevant background is contained in the Motion to Dismiss and the broader Court record, the following is provided to assist the Court in understanding the extent of Ms. Engelhorn's issues with the parties involved.

Ms. Engelhorn's troubles began when Mr. Bolog, as an agent or employee of the law firm of Whiteford, Taylor & Preston, LLP ("WTP"), had access to her monies. Despite numerous prior suits against Mr. Bolog, some alleging fraud, WTP allowed Mr. Bolog to continue working at the firm and allowed him access to Ms. Engelhorn's case. Ultimately, however, WTP "fired Mr. Bolog, in part because of irregularities in his expense-accounting on the Engelhorn matter…."[7]

As stated in the Amended Complaint, after winning a lawsuit, in early October 2021, Mr. Bolog defrauded Ms. Engelhorn by embezzling and misappropriating $10 million. The fraud included hoodwinking Ms. Engelhorn into believing she was signing routine legal documents, when, in fact, she was signing a Notice of Gift, a trust agreement that established Mr. Bolog as the trustee and primary beneficiary, and authorization of wiring the $10 million into the trust fraudulently established by Mr. Bolog. Once Ms. Engelhorn discovered the truth of Mr. Bolog's scheme, she demanded her money back, which he refused.

As further alleged, the fraudulent establishment of the trust was just the beginning of the scheme against Ms., Engelhorn, a woman of considerable financial means but with little business experience. Mr. Bolog continued to use Ms. Engelhorn's monies as his own private bank account, funding his own projects and those of his friends, including Mr. Postal.

---

[7] *See* Memorandum in Support of Defendant Whiteford, Taylor & Preston LLP's Petition for an Order Compelling Arbitration and Staying Proceedings and Motion to Dismiss or Stay.

With respect to Swain Landing, Mr. Bolog not only introduced Ms. Engelhorn to Mr. Postal and the Swain Landing project but organized and implemented the release of Ms. Engelhorn's money to fund Swain Landing. On January 5, 2022, the date after Swain Landing was incorporated, Mr. Bolog emailed White Pearl's bank and stated that White Pearl was making a $585,000 transfer to the account for Swain Landing. The money was transferred the next day. Amended Complaint at ¶ 72-73.

At no point did Mr. Bolog or Mr. Postal reveal their connection to each other or Mr. Bolog's involvement in Swain Landing to the Movants, contrary to Mr. Bolog's ethical duties. *Id.* at ¶ 74. Accordingly, Ms. Engelhorn and the co-Movants were brought into an operation that was obscured at the onset. Movants had no transparency into the various connections and intent behind Swain Landing and Movants' money was used to fund Swain Landing's scheme before Ms. Engelhorn or any other authorized representative of the Trust or White Pearl had an opportunity to fully vet the investment with a nonconflicted advisor.

Once Ms. Engelhorn learned of Mr. Bolog's wrongdoings, she sought to extract herself from Swain Landing, initially to have one less point of connection with Mr. Bolog. On November 27, 2022, counsel for Ms. Engelhorn sent a letter to Swain Landing indicating that Mr. Bolog had been removed as trustee of the Trust and to subsequently remove him from notices related to Swain Landing. *See* **Exhibit C**.

On August 21, 2023, counsel for Ms. Engelhorn sent an email to Mr. Postal indicating that Movants, including Ms. Engelhorn, had myriad issues with Mr. Bolog and no longer wished to continue in Swain Landing. *See* **Exhibit D**. Mr. Postal replied on the same day indicating that he was sorry for the issues with Mr. Bolog and offered to "mediate a resolution with Erik." Mr. Postal then offers a suggestion to extract Ms. Engelhorn from Swain Landing. *Id.* Counsel for Ms.

Engelhorn followed up on how to extract her from Swain Landing by letter dated November 17, 2023. *See* **Exhibit E**. Counsel confirmed in this letter that no operating agreement exists for Swain Landing, given that none of the Movants executed the drafted agreement. *Id.* Mr. Postal does not appear to have challenged that assertion.

On November 27, 2023, counsel for Ms. Engelhorn sent an email to Mr. Postal confirming that "per our discussion, you will try to return Claudia's investment in Swain's Landing … during the first quarter of 2024." *See* **Exhibit F** (the "November 2023 Email"). Mr. Postal immediately wrote back: "Confirmed" and stated the amount of Ms. Engelhorn's initial investment, $585,000.00. *Id.* After three months of attempting to extricate herself from Swain Landing, Ms. Engelhorn was informed that she was going to be able to receive her money back.

As indicated in the November 2023 Email, Ms. Engelhorn's money was to be returned by the first quarter of 2024. Accordingly, on February 12, 2024, counsel sent an email to Mr. Postal inquiring about the status of the return of the Contribution. *See* **Exhibit G.** Mr. Postal immediately replies indicating that a new investor would likely be buying Ms. Engelhorn's position, but that there were some alleged issues with water availability that required resolution first. *Id.*

After the expiration of the first quarter of 2024, and without the return of the Contribution, counsel for Ms. Engelhorn began a series of communications with Mr. Postal throughout April and May 2024. First, on April 17, 2024, counsel sent another letter to Mr. Postal requesting return of Ms. Engelhorn's capital contribution. *See* **Exhibit H**. Mr. Postal replied *via* email on April 18, 2024, advising that the investor that would buy Ms. Engelhorn's position was waiting on certain approvals, which could not be obtained because the Town of LaPlata was allegedly negotiating with Charles County over water allocation. *See* **Exhibit I**. Counsel for Ms. Engelhorn then

requested availability from Mr. Postal for a call three times, on April 24, 2024, May 1, 2024, and May 8, 2024, without response. *Id.*

Movants' counsel attempted multiple times over the course of eight months to extract the Movants from Swain Landing. *See* **Exs. C-I**. Mr. Postal assured counsel on multiple occasions that Ms. Engelhorn would receive the Contribution back, but nothing ever came of these assurances. *Id.* Had Mr. Postal returned Ms. Engelhorn's investment as promised, Movants would likely have no occasion to challenge this bankruptcy case.

However, Mr. Postal continued to lead Ms. Engelhorn on, as has happened multiple times during her involvement with Swain Landing and the Bolog Defendants. Now, the Debtor has filed this bankruptcy case without proper authority and in bad faith. Movants, in turn, seek to terminate this case one commenced in an improper forum by the Debtor and others to create mischief.

## REPLY

**I.      Mr. Postal did not Have Authority to File the Petition.**

*A.      Neither the "Original" Operating Agreement nor the Unsigned Operating Agreement are Neither Valid Nor Enforceable.*

1.      As an initial matter, the Debtor contends that Movants selectively quoted from Maryland Code, Corps. & Ass'ns, § 4A-403(a) by leaving out the phrase "unless otherwise agreed," indicating that the provisions of the Maryland Code are only applicable when there is no valid operating agreement.

2.      The Movants fully recognize this portion of the Maryland Code and agree that, if there was a valid operating agreement that appropriately vested a manager with the authority to file for bankruptcy, then the terms of that operating agreement may win out over the requirement in Maryland law to have unanimous consent from all members in order to file for bankruptcy.

3.      Movants did not discuss this portion of the Maryland Code because it is irrelevant. The Movants' position with respect to the Unsigned Operating Agreement was made clear from the beginning of the Motion to Dismiss, namely that it was not signed by all members, is therefore invalid, and should be given no weight or authority on the issue of corporate authority. Accordingly, because there was no known and valid operating agreement for Swain Landing on which to rely, Maryland law governs, and Maryland law requires unanimous consent from all members for an limited liability company to file for bankruptcy.

4.      The Debtor then proffers that the "Original" Operating Agreement is the controlling document for Swain Landing and that it binds the Movants as far as it provides that additional members are "bound by all the covenants, terms and conditions of this Agreement." Ex. A ¶ 31. Movants dispute the validity and enforceability of this agreement as they were unaware of it until it was appended to the Opposition. Further, the timing of the "Original" Operating Agreement is questionable as, even by the Debtor's own admission, it is dated prior to the Debtor even existing. Opposition at 4, n1.

5.      Movants' lack of awareness of the "Original" Operating Agreement is further supported by communication from the Movants' counsel indicating that there is no operating agreement in place for Swain Landing. *See* **Ex. E**. Nor does the Debtor claim that it presented the Movants with a copy of the "Original" Operating Agreement at any time prior to filing its Opposition. To the contrary, the only operating agreement known to have been presented to Ms. Engelhorn was a copy of the Unsigned Operating Agreement, which she refused to execute. That Unsigned Operating Agreement, like the "Original" Operating Agreement was never signed by her or the co-Movants. As such, the members holding 50% of the Debtor never signed either Operating Agreement and did not otherwise authorize the filing of this bankruptcy case.

6.      Keeping Ms. Engelhorn in the dark about Swain Landing is, unfortunately, nothing new. The Amended Complaint details the level of fraud to which Ms. Engelhorn was subjected. As such, the integrity of the "Original" Operating Agreement is beyond dubious. As noted in the Amended Complaint, the funds from White Pearl were wired on January 6, 2022 (Motion to Dismiss Ex. E at ¶ 73), a mere two days after the incorporation of Swain Landing and the alleged enactment of the "Original" Operating Agreement. Even assuming the "Original" Operating Agreement had been executed by the other two members of Swain Landing (Messrs. Postal and Jones) prior to Movants participation, it is not enforceable against Movants as they were not presented with it and did not otherwise agreed to be bound by it. Movants should not be found to be bound by a document they never saw, and, as the Movants are 50% owners of Swain Landing, that document should not be deemed controlling, especially on an issue so important as authority to seek bankruptcy protection.

7.      Under Maryland law limited liability company's operating agreement is governed by contract law. *See e.g., In re Siegal*, 591 B.R. 609, 619 n10 (Bankr. D. Md. 2018); *In re Solomons One, LLC*, 2013 WL 5934656, at * 4 (Bankr. D. Md. Oct. 31, 2013). Basic contract law dictates that there must be mutual asset by the parties to be bound. *See* Rest. 2d Contr. § 17; *see also Hasler Mailing Systems, Inc. v. U.S. Postal Service*, 885 F.Supp.3d 156, 182 (D.D.C. 2012) (entering judgment for the defendant because the plaintiffs failed to establish a mutuality of intent to contract with the defendant); *Williams v. General Elec.*, 13 F.Supp.3d 1176, 1184 (N.D. Ala. 2014) (denying defendant's motion to dismiss because the defendant failed to issue the plaintiff an employee handbook and thus defendant could not rely on plaintiff's acceptance of the handbook as evidence of an offer or its communication and thus there was no meeting of the minds); *U.S. v. Lua*, 990 F.Supp. 704, 705, 710 (N.D. Iowa 1998) (no meeting of the minds existed where critical

details of a cooperation agreement were not discussed between the parties); *In re Carbone*, 626

B.R. 262, 266 (Bankr. E.D. Pa. 2021) (explaining that one of the most basic requirements for the

existence of a contract was the manifestation of mutual assent).

8.      Additionally, if the "Original" Operating Agreement was not created until after the

Movants became 50% members in Swain Landing, the "Original" Operating Agreement cannot be

valid because there would have similarly been a lack of meeting of the minds from the parties to

be bound. For these reasons, the Court should dismiss the bankruptcy case.

> **B.      Neither Operating Agreement, Even if Valid, Grants the Manager Authority to Unilaterally File a Bankruptcy Petition.**

9.      Assuming, *arguendo*, that either the "Original" Operating Agreement or Unsigned

Operating Agreement is valid, neither provides authority for the manager to unilaterally file for

bankruptcy.

10.     The Debtor asserts that "a limited liability company's manager, enjoying broad

authority under an operating agreement, is empowered to seek bankruptcy protection for the

company even if such a right is not specifically delineated." Opposition at 5. However, each of the

three cases cited to support this proposition is distinguishable, unpersuasive, and cannot rebut the

argument and authority Movants provided in the Motion to Dismiss that this bankruptcy case could

not be authorized absent 100% membership consent, which was not provided.

11.     The Debtor first looks to *In re Emergency Hosp. Sys., LLC*, 2024 Bankr. LEXIS

2905, at *13 (Bankr. S.D. Tex. Dec. 5, 2024). In *Emergency Hosp. Sys.*, the court notes that the

operating agreement at issue is "silent as to whether the [manager] has authority to file a petition

in bankruptcy on behalf of [a limited liability company] without the consent of the [members].

Likewise, Texas LLC law does not specify what type of consent is required by the members of an

LLC prior to filing a petition in bankruptcy." *Id*. The court goes on to examine what authority was

granted within the operating agreement, but this aside indicates that, had Texas law indicated what type of authority was required to file for bankruptcy, it might have been controlling. Here, Maryland law provides that, absent agreement otherwise, unanimous member consent is required to file for bankruptcy. Thus, while the *Emergency Hosp. Sys.* court had to consider, under Texas law, the broad authority granted to a manager in the operating agreement, this Court does not have to look further than Maryland law.

12.     The same analysis applies to *In re East End Development, LLC*, 491 B.R. 633, 639 (Bankr. E.D.N.Y. 2013) which examined at the issue under New York law. There, the court notes that the operating agreement is "silent as to whether the [manager] has authority to file a petition in bankruptcy on behalf of the [d]ebtor without the consent of [member]. Likewise, the New York LLC laws do not specify what type of consent is required by the members of an LLC prior to filing a petition in bankruptcy." Again, while New York law may not specify what type of consent is required for a bankruptcy filing, Maryland law does and no agreement between the parties exists to override Maryland law.

13.     Finally, in *In re Lexington Hospitality Group, LLC*, 577 B.R. 676 (Bankr. E.D. Ky. 2017), the court, relying on Kentucky law, found that no provision in the operating agreement expressly provided the manager authority or lack of authority to file bankruptcy. *Lexington Hospitality Group*, 577 B.R. at 686. Because the operating agreement gave the manager broad authority "except as expressly provided otherwise in [the operating agreement]" the court held that the manager had the authority to file for bankruptcy. *Id.* at 686-87. The *Lexington Hospitality* court expressly looked to Kentucky law to support this position, noting that "courts look to Kentucky law when an operating agreement is silent, and the Kentucky Act supports a manager's authority to file bankruptcy on the [c]ompany's behalf." *Id*. at 687. As with *Emergency Hosp. Sys.* and *East*

*End Development*, there is a difference of state law which controls here. While Kentucky law may permit for the unilateral filing of a manager for bankruptcy protection, Maryland law does not.

14.     Accordingly, although there may be some authority under other state law that a broad grant of power to a manager may be grounds for a manager to file for bankruptcy, each case cited by the Debtor applies state law that is fundamentally different than Maryland state law. This Court should not read into either Operating Agreement authority for the manager to unilaterally file for bankruptcy relief as doing so would run contrary to Maryland law which is controlling on the issue. Because Mr. Postal did not have the requisite authority to file this bankruptcy case, it should be dismissed.

### C.     *Swain Landing was a Forfeited Limited Liability Company on the Petition Date and Thus Ineligible to File for Bankruptcy Protection*.

15.     Under Maryland law, a forfeited limited liability company is prohibited from doing business or using its name. Md. Code, Corp. & Ass'ns. § 4A-911. While Maryland law provides that a forfeited limited liability company may defend an action in court (Md. Code, Corp. & Ass'ns. § 4A-920) the Maryland Appellate Court held that a forfeited limited liability company may *only* defend actions in court, not bring them. *Price v. Upper Chesapeake Health Ventures*, 192 Md.App. 695, 708 (2010).

16.     In response, the Debtor seeks to rely on *Peide Yan v. Zhengang Zhang*, 2018 WL 1316242 (D. Md. Mar. 14, 2018) and *In re Heark Corp.*, 18 B.R. 557 (Bankr. D. Md. 1982) to support its contention that a "forfeited entity may still seek bankruptcy protection." Opposition at 9. Neither case stands for this proposition outright, and each case is of questionable viability as a result of subsequent legal developments as well are factually distinguishable from the case at hand as neither case relied on by the Debtor considered an effort by a forfeited limited liability company to reorganize, as is the case here.

13

17.     In *Peide Yan* a forfeited limited liability company was considered a qualified petitioning creditor and allowed to take action to place a debtor into involuntary bankruptcy in order to protect the obligation owed to the forfeited limited liability company. *Peide Yan*, 2018 WL 1316242, at *2. The Bankruptcy Court had previously determined that, due to the forfeiture of the limited liability company's right to do business and the right to use its name in Maryland, the limited liability company was ineligible to be a petitioning creditor. *Id.* On appeal, the District Court disagreed and held that nothing in the *Price* decision, or Maryland law prevented a forfeited limited liability company from initiating an involuntary bankruptcy proceeding in federal bankruptcy court. *Id*. at 4.

18.     In support, the *Peide Yan* court turned to *Willow Grove Citizens Ass'n v. County Council of Prince George's County*, 175 A.3d 852 (Md. Ct. Spec. App. 2017). In *Willow Grove* the Maryland Court of Special Appeals had held that a forfeited limited liability company was able to file an application for a special exception with a state agency without violating the Maryland Code prohibition on "doing business" because, upon forfeiture, an limited liability company does not become a non-entity and forfeiture has no effect on the validity of an limited liability company's contracts or other acts. *Willow Grove*, 175 A.3d at 856. Taken together, *Peide Yan* and *Willow Grove* provide that a forfeited limited liability company may, in limited instances, petition a court for relief without violating Maryland law. However, the efficacy of both decisions is questionable considering more recent authority.

19.     In *United Corrosion Control, LLC v. Carboline Company*, 2022 WL 861411 (D. Md. Mar. 23, 2022), the District Court cautioned against reliance on *Pein Yan* and *Willow Grove*, finding their holdings were "exceptions that swallowed the rule." *Id*. at *5. There, the plaintiff, a forfeited limited liability company, filed a diversity action in Maryland district court. The district

court granted defendant's motion for summary judgment dismissal. *Id*. at *1. The District Court reasoned that the action's basis in diversity jurisdiction created strong grounds for dismissal. *Id*. at *4. Because the plaintiff would not have been able to bring its claims against a non-diverse defendant in state court, the District Court was "loathe to expand [the Savings Clause's] breadth" by allowing the forfeited limited liability company to continue its suit in federal court. *Id.* at *5.

20.     The other case upon which the Debtor seeks to rely is *Heark*, a 1982 decision from the Maryland bankruptcy court that addressed a forfeited entity's right to seek a chapter 7 liquidation. While *Heark* found that the entity had a right to seek chapter 7 liquidation, it is decision was based upon the prior version of the Maryland Code that expressly permitted winddown as a duty of a director of forfeited entity. It also did not deal with an limited liability company or the limited liability company provisions of the Maryland Code, which were not enacted until 1992. Additionally, the Debtor here does not seek to liquidate but is seeking to regain its asset and restart its business. *See* Opposition at 9. As such, the present case is legally and factually distinguishable from *Heark*, which is no value to the Debtor's position and should not be relied upon as a basis to find that a forfeited Maryland entity may seek bankruptcy to reorganize. Rather, here, where there have been no known efforts to reinstate the Debtor, an limited liability company, as an operating business, the Debtor's filing for subchapter V reorganization is a violation of Maryland state law and should be dismissed.

## II.     The Debtor Does Not Meet the Definition of a "Small Business Debtor" as Defined in 11 U.S.C. § 101(51D).

21.     Despite the Debtor's assertions that it qualifies as a "small business debtor," the totality of the circumstances surrounding this bankruptcy case indicate that the Debtor does not so qualify.

22.     As an initial matter, the Debtor's forfeited status shows that the Debtor was not, and could not have been, lawfully engaging in business operations as of the Petition Date. The Debtor acknowledges this and, instead, attempts to rely on the broader term "business activities" to support its assertion that it is a small business debtor. Opposition at 9.

23.     There is no dispute that case law allows a broader interpretation of what constitutes "commercial or business activities" beyond merely operating a business. *See, e.g.*, *In re Stevens*, 667 B.R. 428, 438 (Bankr. S.D.W. Va. 2025) (recognizing that the statute does not include the word "operations" and instead "uses the broader term 'activities.'") However, that interpretation is neither unlimited nor does it rescue the Debtor. As stated by the court in *In re Thurmon*, 625 B.R. 417, 423 (Bankr. W.D. Mo. 2020), "[i]f Congress had intended to make all debtors with business debts below the debt cap eligible for subchapter V small business relief regardless of whether the business was still operating, it could have done so."

24.     Thus, while Movants recognize that the case law does not require a business to be operating — and indeed the Debtor's business was not, or ought not to have been, operating — there is a requirement that a debtor shows some connection to business activities, which the Debtor cannot demonstrate here.

25.     The Debtor relies primarily on two cases to support its assertion that it was engaged in business activities, *In re Fama-Chiarizia*, 655 B.R. 48 (Bankr. E.D.N.Y. 2023) and *In re Hillman*, 2023 WL 3804195 (Bankr. N.D.N.Y. June 2, 2023) by virtue of the avoidance action filed by the Debtor and the Debtor's involvement in the Civil Court Action.

26.     The court's decision in *Fama-Chiarizia* rests on an individual debtor attempting to address a pre-petition judgment debt that related to a business she had owned with her brother. The court recognized that the word "activities" is broader than "operating" and allows for a wider range

16

of qualifying acts, including addressing "residual business debt, and to marshal residual business assets." *Fama-Chiarizia*, 655 B.R. at 69. The *Hillman* court similarly found that an individual who was engaged in state court litigation related to his personal guaranty was engaged in "sufficient winding down activity for the [d]ebtor to satisfy the 'engaged in commercial or business activities' requirement." *Hillman*, 2023 WL 3804195, at *4.

27.     However, both the *Fama-Chiarizia* and *Hillman* courts agree that courts should consider the "totality of the circumstances" when assessing whether a debtor is engaged in business or commercial activities as of the petition date. *Fama-Chiarizia*, 655 B.R. at 64; *Hillman*, 2023 WL 3804195, at *4.

28.     A case from this year, *In re Stevens*, further agrees with assessing the totality of the circumstances. In *Stevens,* although the debtors' business shut down in 2011, the debtors were still collecting rental payments on their last remaining asset. *In re Stevens*, 667 B.R. at 439. Additionally, the debtors had personal liability for the debts of the business. *Id*. at 440. In considering the totality of the circumstances, the court concluded that the debtors were engaged in business activity because they were still collecting rents up to the petition date. *Id*.

29.     None of these facts, or anything close, are present here. The Debtor was not merely non-operational prior to the Petition Date, it was forfeited and prohibited from operating for 226 days prior to the Petition Date. The Debtor is not attempting to address legacy business debt, it is trying to revive its only asset, which it lost due to default and recission. The Debtor is not winding down its business, it is attempting to restart its business without authority to do so from the Maryland Secretary of State. While the Debtor was involved in the Civil Court Action, its role in that case is relatively small, as the major targets are the Bolog Defendants. As such, the totality of

the circumstances indicates that there are numerous other reasons to not consider the Debtor a small business debtor, notwithstanding of its slight involvement in the Civil Court Action.

30.     Additionally, the Debtor asserts that this Court should refrain from finding it ineligible for subchapter V relief because Movants did not file a challenge to the subchapter V designation within the appropriate deadline. The Debtor's calculation is in error. Bankruptcy Rule 1020 designates the timeline to challenge designation as "30 days after the conclusion of the meeting of creditors held under §341(a)…" Fed. R. Bankr. P. 1020. As the Motion to Dismiss was filed on July 10, 2025, and the § 341 meeting of creditors was concluded on June 11, 2025, the Motion to Dismiss was filed within the deadline proscribed by Bankruptcy Rule 1020.

31.     Accordingly, the Court should hold that the Debtor is not a small business debtor and should not be permitted to continue under subchapter V. Given this and the other deficiencies with the Petition, the Movants urge this Court to dismiss this bankruptcy case.

## III.     D.C. is an Improper Venue.

32.     The District of Columbia is not the appropriate venue for this bankruptcy case.

33.     The Debtor argues in the Opposition that D.C. was its "*only* place of business when this case was filed." Opposition at 1, 14. Notably, however, the Debtor was not authorized and did not, in fact, operate at all prior to this case being filed, due to its forfeited status. For 226 days prior to the Petition Date, the Debtor was prohibited from operating a business. *See*, Md. Code, Corp. & Ass'ns. § 4A-911. Thus, to the extent the Debtor was conducting business in the 180 days prior to the Petition Date (which it was not), it was in violation of Maryland law.

34.     The fact that the Debtor could not be operating its business lawfully within the 180 days prior to the Petition Date does not somehow make Washington, DC an appropriate forum. To the contrary. "[T]he court determines proper venue by reference to facts existing during the 180 days prior to the commencement of the case to determine the district of the debtor's residence,

domicile, principal place of business, or *location of the person's principal assets*." *HSBC Bank USA v. Handel (In re Handel)*, 253 B.R. 308, 310 (1st Cir. B.A.P. 2000) (citing *In Micci v. Bank of New Haven (In re Micci)*, 188 B.R. 697, 699 (S.D. Fla. 1995) (emphasis added). In this case, Debtor's alleged principal asset, real property, is located in Maryland.

35.    Furthermore, in the case of a business entity, a debtor's domicile for venue purposes is the state in which that debtor was organized or incorporated. *See In re ERG Intermediate Hldgs., LLC*, 2015 WL 6521607, at *4 (Bankr. N.D. Tex. Oct. 27, 2015); *In re EB Cap. Mgmt., LLC*, No. 11-14626 (MG), 2011 WL 2838115, at *9 (Bankr. S.D.N.Y. July 14, 2011) ("A corporation's domicile is generally held to be its state of incorporation.") (citation omitted). Here, there is no dispute that the Debtor is a Maryland limited liability company, organized under the laws of Maryland with its registered agent located within the state. Furthermore, there is no dispute that the Debtor never registered to conduct business in the District of Columbia.

36.    A debtor's principal place of business typically is the place where management decisions are being made. *In re Peachtree Lane Assocs., Ltd.*, 150 F.3d 788, 795 (7th Cir. 1998) ("principal place of business" under section 1408 refers to "the location of the entity's primary decisionmakers"); *Commonwealth of P.R. v. Commonwealth Oil Refin. Co. (Matter of Commonwealth Oil Refin. Co.)*, 596 F.2d 1239, 1246 (5th Cir. 1979) (holding, under predecessor statute to section 1408, that principal place of business for bankruptcy venue is "where a debtor manages its business"). Here, the Debtor claims Washington, D.C. is the Debtor's principal place of business because it is where Mr. Postal allegedly resides. Even if true, this does not rescue the Debtor as the only management decision in the 180-days prepetition was to file this bankruptcy case. In fact, within the 180 days prior to the Petition Date the Debtor took no action and defaulted in the recission action brought by the Swains, thus losing its principal asset. The assertion by the

Debtor of operating in the District of Columbia is therefore without merit and the case should be dismissed.

37.    There is also a disconnect as to what the actual principal place of business was in Washington, DC, if at all. In the "Original" Operating Agreement, the principal place of business is listed as Mr. Postal's home address. However, in the Unsigned Operating Agreement, the principal place of business is listed as 1800 M Street, which appears to be the address of WTP, where Mr. Bolog worked. The lack of consistency between these two documents is yet another deficiency and should result in a determination that this chapter 11 case is not properly venued in Washington D.C.

38.    Accordingly, while the Debtor may contend that its principal place of business was in the District of Columbia, that assertion is suspect. Moreover, the remainder of the considerations concerning venue, which include domicile, and principal place of assets, establish Maryland as the only potential venue for this case. Thus, Mr. Postal's home address should not be the basis upon which to warrant venue, and this bankruptcy case should be dismissed.

IV.    **The Bankruptcy Petition Was Filed in Bad Faith.**

39.    "A debtor's bad faith constitutes cause for conversion or dismissal of the case. Determination of a debtor's bad faith is a factual inquiry based upon the totality of the circumstances including the debtor's atypical conduct, attempts to manipulate or abuse the bankruptcy process, inaccuracies in stated debts and expenses, and fraudulent representations." *In re Steiner*, 668 B.R. 222, 264 (Bankr. W.D. Mo. 2025); *see also In re Collins*, 250 B.R. 645, 664 (Bankr. N.D. Ill. 2000) (holding that a chapter 7 bankruptcy petition was filed "not to obtain relief for an honest but unfortunate debtor, but as a cutthroat litigation tactic intended to delay and

frustrate [litigation]" and that the bankruptcy was being used to "bring an abrupt and favorable end to the litigation after forming the belief that [the debtor] was going to lose on the merits.").

40.    The Debtor maintains that it had a legitimate bankruptcy purpose for filing this bankruptcy case, namely filing an avoidance action to reverse a default judgment and claw back its principal asset. Opposition at 18. However, the history among the Movants, the Bolog Defendants, and the Debtor (including Mr. Bolog's involvement), shows that there has been bad faith throughout and this bankruptcy case is not an exception.

41.    The Amended Complaint details the multiple instances of fraud experienced by Ms. Engelhorn at the hands of Mr. Bolog and his affiliates. Movants' involvement in Swain Landing is similarly swept up in that deceit. Mr. Bolog was representing Ms. Engelhorn at the time she became involved with Swain Landing. It was at Mr. Bolog's direction that money was directed from White Pearl to fund Swain Landing and all this was done without disclosure to Ms. Engelhorn of Mr. Bolog's involvement in Swain Landing or his relationship with Mr. Postal.

42.    The Movants' investment in Swain Landing represents an amount nine (9) times that of the next highest investor, Mr. Postal. Movants were the main investors of over half a million dollars. Mr. Postal did not even invest six figures in the enterprise, whereas a significant portion of Movants' money was used to fund the purchase of the subject real estate, without appropriate disclosures by Messrs. Postal or Bolog. While Mr. Postal's claim of ignorance of all aspects of the Bolog Defendants' actions may warrant further exploration, his repeated and unfulfilled claims that he would restore Movants' Contribution, led Movants' on for more than year and support a finding of bad faith.

43.    Additionally, there can be no doubt that this bankruptcy case has delayed the Civil Court Action through the removal and effort to transfer venue, particularly because the Movants

are being forced to litigate issues that were already determined in the Circuit Court.[8]  This too evidences bad faith.

44.      Even assuming an avoidance action may constitute a legitimate purpose for filing, there is dubious pretext here where the Debtor lost its asset through a court process and now seeks to overturn that process while reaping the benefit of the automatic stay as to the Civil Court Action and delaying the Movants' litigation against the other parties to the Civil Court Action.

45.      At bottom, this bankruptcy case was filed against a backdrop of lies and fraud. It is no wonder Ms. Engelhorn wanted out of Swain Landing for eight months before the Petition Date and it is no wonder that the Movants now seek to have this bankruptcy case dismissed as a mere delay tactic rather than a good faith filing.

*[Remainder of page intentionally left blank]*

---

[8] *See Bolog Parties' Motion Under Federal Rules of Bankruptcy Procedure 8002(d)(1) and 9024 and 9 U.S.C. §§ 3&4* [Adv. Pro. Docket No. 42] and attached exhibits and *Plaintiff' Opposition to Bolog Defendants' Motion Under Federal Rules of Bankruptcy Procedure 8002(d)(1) and 9024 and 9 U.S.C. §§ 3&4 to Compel Arbitration or, Alternatively, to Extend the Time to File a Notice of Appeal* [Adv. Pro. Docket No. 46].

## **CONCLUSION**

For the foregoing reasons, the Debtor's chapter 11 case should be dismissed, and the Court

should grant all further relief as is just and proper.

Dated: July 30, 2025

/s/ Sam J. Alberts
Sam J. Alberts (DC Bar # 443260)
David F. Cook (DC Bar #1708239)
DENTONS US LLP
1900 K Street, NW
Washington, DC 20006
Tel. (202) 496-7500
Email: sam.alberts@dentons.com
Email: david.f.cook@dentons.com

Elysa Chew (*pro hac vice* motion to be filed)
DENTONS US LLP
233 S. Wacker Drive, #5900
Chicago, IL 60606
Tel: (312) 876-8000
Email: elysa.chew@dentons.com

and

Wes P. Henderson, Esq. (DC Bar #502935)
Patrick D. Gardiner, Esq. (DC Bar #1630864)
HENDERSON LAW, LLC
2127 Espey Court, Suite 204
Crofton, Maryland 21114
T: (410) 721-1979
F: (410) 721-2258
wph@hendersonlawllc.com
patrick@hendersonlawllc.com

*Co-Counsel for Claudia Engelhorn,*
*Individually and on behalf of the Whitewater*
*Revocable Trust, and White Pearl, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 30th day of July 2025, a copy of the foregoing was served electronically upon filing via the ECF system, with copies being sent to all parties receiving electronic notice herein.

*<u>/s/ Sam J. Alberts</u>*
Sam J. Alberts